JOHN PENN, Trustee, *et al.*

*v.*

W. M. FOGLER *et al.* .

*Opinion filed October 25, 1899.*

1. EXECUTORS AND ADMINISTRATORS—*administrator with will annexed does not succeed to executor's personal trusts.* An administrator with the will annexed succeeds to the duties and powers of the executor which result from the nature of his office as executor, but not to those in the nature of a personal trust or confidence.

2. SAME—*right of administrator with will annexed to ask aid of a court of equity.* It is the right of an administrator with the will annexed to apply to a court of equity for the appointment of a trustee to carry out the provisions of the will which do not strictly devolve upon him as such administrator.

3. SAME—*when decree does not warrant administrator's assumption of trust powers.* A decree which confers upon an administrator with the will annexed "all the powers, rights, duties and authority that an executor could or might have if named in said will," does not authorize him to exercise trust powers conferred upon the executor, but only such as appertain strictly to the office of executor.

4. SAME—*that administrator with will annexed is to report to county court excludes idea of his acting as trustee.* A requirement in a decree conferring authority upon an administrator with the will annexed that he shall report to the county court precludes the idea that he is to exercise trust powers reposed in the executor, since he would then have been required to report to the chancery court.

5. SAME—*administrator managing trust fund without authority is a trustee de son tort.* Management of trust property without authority by an administrator with the will annexed constitutes him a trustee *de son tort,* and renders him and his co-investors with notice equally liable for loss sustained.

6. TRUSTS—*principal should not be depleted to make up deficiency in allowance from income.* The principal of a trust fund cannot be resorted to for the purpose of making up the accruing deficiencies in a monthly or yearly allowance to be paid from income of fund.

7. SAME—*what an improper investment of trust fund by administrator with will annexed.* An administrator with the will annexed who holds national bank stock in trust is without authority, upon the surrender of the charter of the bank, to invest the trust fund in a banking partnership which continues the business.

8. SAME—*when trustee will not be protected against loss.* In the absence of specific directions by the settlor a trustee should invest trust funds in real estate or government securities, or, if acting

under the direction of the court, in such securities as it may approve, otherwise he will not be protected against loss.

9. SAME—*what will not authorize trustee to invest in private banking business.*  A preference expressed in a will for the investment of a trust fund in national bank stock does not justify the trustee in continuing the investment in a private banking partnership which succeeded the national bank on the surrender of its charter.

10. SAME—*trustee is liable for loss on investment in absence of acquiescence by beneficiary.*  A trustee who improperly invests the trust fund in a business enterprise is liable to the beneficiary for resulting loss, in the absence of acquiescence by the latter.

11. PARTNERSHIP—*partners knowing that co-partner has invested trust fund are liable to beneficiary.*  Partners or stockholders in a banking partnership having notice that one of the partners has invested trust funds in the business are liable to the beneficiary.

12. SAME—*investment of trust fund—liability of incoming partners.*  Incoming partners who have notice that a trust fund is invested in the partnership business are chargeable with liabilities occasioned by the violation of the trust after they became members.

13. SAME—*liability of selling partner for misuse of trust fund not terminated by sale.*  Incoming partners who have notice that a trust fund is invested in the business are not chargeable with liabilities for violation of the trust before they became members, but the parties whose interests they bought, and who knew of such investment, remain liable to the extent of their interests so sold.

14. LACHES—*laches not imputed in action for fraud until fraud was disclosed.*  Laches cannot be imputed to complainant in an action based on fraud until discovery of the fraud, or until it could have been discovered by the use of reasonable diligence.

15. EVIDENCE—*what competent on accounting against firm for misuse of trust fund.*  Where the charging part of the bill makes a case for account against partners for mismanagement of a trust fund, evidence which discloses other facts in addition to those charged is admissible when it strengthens the right claimed and merely expands the measure of accounting.

16. ESTOPPEL—*remainder-man not estopped to complain of misuse of property before it falls into possession.*  Estoppel against a remainder-man by acquiescence in a misuse of the property cannot arise until his interest falls into possession.

*Penn* v. *Fogler*, 77 Ill. App. 365, reversed.

APPEAL from the Appellate Court for the Fourth District;—heard in that court on writ of error to the Circuit Court of Fayette county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

This is a bill in chancery, filed September 1, 1896, by W. M. Fogler, and George W. Brown, the latter being administrator with the will annexed of the estate of Nathaniel M. McCurdy, deceased, and others, stockholders or partners in a certain banking firm, known as the Bank of Vandalia, against certain other stockholders or partners therein, and Imogene Marr, Harrietta Marr, McKendree College, and the Church Extension Society of the Methodist Episcopal Church, beneficiaries under the will of the said Nathaniel M. McCurdy, deceased, for the purpose of winding up the partnership affairs of said firm under the direction of the court, and for the appointment of a receiver of the firm assets; and for the distribution thereof after the payment of the firm liabilities, and for general relief.

The bill sets up the existence of the National Bank of Vandalia in Vandalia prior to April 2, 1883, and alleges, that it did a general banking business under the charter, issued to it under authority of the National Banking act, with a paid-up capital stock of $100,000.00; that, on April 2, 1883, the stock was controlled and owned in certain proportions by certain persons, and, that among them, the Nathaniel M. McCurdy estate, of which George W. Brown was the administrator with the will annexed, owned $40,000.00 of the stock; that the bonds deposited for the guaranty of the circulating currency were called in for redemption; that, the premiums on the bonds being at that time very high, the stockholders surrendered the charter, and continued the banking business as a co-partnership from April 2, 1883, to May 1, 1895, with the same persons and the same capital with certain exceptions therein set forth; that the partners were to share in the losses and profits in proportion to the amount invested by each respectively; that Lydia A. Fogler withdrew on June 8, 1887, her capital stock of $15,000.00; that certain stockholders died in 1890, 1894, and 1895, leaving heirs and representatives, upon whose estates adminis-

trators and executors were qualified; that certain stock
was sold, and the purchasers admitted as partners; that,
on the dissolution of the firm, the interests of its mem-
bers were two-fifths thereof, or $40,000.00 in the McCurdy
estate, and the other three-fifths in certain other persons,
whose respective interests are named; that real estate
was taken in settlement of bad debts; that the firm has
notes and other evidences of indebtedness; that the assets
should be reduced to money to pay creditors and to make
distribution; that no settlement of the partnership affairs
has ever been made; that the will provides for the pay-
ment of an annuity to Harrietta and Imogene Marr during
their lives out of the earnings of the capital invested in
the banking business; and that, at their death, such cap-
ital is to be divided between said college and said church
extension society.

A decree was made, appointing a receiver and order-
ing him to take charge of the partnership assets.

One John Penn, trustee, who had been appointed trus-
tee in a proceeding in chancery commenced by McKen-
dree College and the board of church extension against
George W. Brown and the annuitants as defendants, and
to whom, as such trustee, George W. Brown was ordered
to account for such fund and pay the same over, was
made a party defendant to the original bill, and granted
leave to answer and file a cross-bill. John Penn, trustee,
in his answer, alleged that, when the partnership was
formed on April 2, 1883, Brown was admitted as a gen-
eral partner, and held the stock of the National Bank as
an administrator of the estate, or the proceeds thereof,
and contributed it to, and it was received by, said part-
nership as assets; that the persons, composing the firm
at that time, knew that said fund did not belong to Brown,
but was held by him as administrator, and was subject
to the order of the county court of Fayette county. The
answer further avers, that Brown had no authority to
make such investment; denies the dissolution of the firm;

admits that the co-partners agreed to share the profits and losses, but denies that the legatees of McCurdy made any such agreement.

Penn filed a cross-bill, praying that the said sum of $40,000.00, together with lawful interest thereon, be decreed to be a liability of said partnership, and a prior lien on the firm assets, and that, if the assets are insufficient to discharge the liabilities, a money decree be rendered against the defendants to the cross-bill for the residue; and prayed for general relief. The cross-bill makes parties defendant thereto all the parties to the original bill, except McCurdy's legatees.

The cross-bill avers, that Nathaniel M. McCurdy died, testate, September 29, 1876; that his will was admitted to probate; that, at the time of his death, he owned four hundred shares of the capital stock of the National Bank of Vandalia, which he bequeathed to McKendree College, and the Board of Church Extension of the Methodist Episcopal Church, subject to the payment of certain legacies and annuities out of the earnings of the stock; that, at his death, said shares of stock were worth no less than $100.00 per share; that no trustee was appointed to execute said trust; that Mary K. Marr was to be paid an annuity from the earnings of the stock during her life, and, at her death, the same was to be paid to her two daughters, Harrietta and Imogene, in equal parts; and, at the death of either, the survivor was to receive the whole during life; that Mary K. Marr is dead, and her daughters still survive; that George W. Brown has been appointed, and is acting, as administrator with the will annexed; that the estate is still unsettled; that the stock came into Brown's hands as administrator, and, when received by him, was worth no less than $40,000.00; that the charter of the bank was surrendered on April 2, 1883, and a partnership was formed by said stockholders and Brown to transact a banking business; that the said firm had a partnership fund called "capital stock;" that

Brown contributed the proceeds of said four hundred shares to the partnership; that the same was received by said partners, and each of them knew that no part thereof belonged to Brown, but was the property of Mc-Curdy's legatees; that Brown was the cashier of said National Bank, and of the Bank of Vandalia, and continued as such, until the firm ceased doing business in May, 1895; that said firm has assets and liabilities; and that, among its liabilities, is the said sum of $40,000.00, with lawful interest up to the filing of the cross-bill, which is due cross-complainant, as trustee.

Answers were filed by all the defendants to the cross-bill of John Penn, trustee, but the answer of George W. Brown thereto was separate from the others.

The joint and several answer of the defendants, except Brown, to the cross-bill sets up, that the National Bank of Vandalia ceased to do business, but that the same business was carried on with the same directors, and the same stockholders, at the same place and with the same assets, and with no change except in name; that the continuation of the business by the partnership was in accordance with the will. The answer denies, that Brown contributed to the firm $40,000.00 belonging to the McCurdy estate, or that defendants had notice thereof, or that the partnership is indebted to the beneficiaries of McCurdy, or that the defendants agreed to pay the liabilities of the bank existing when they became interested therein except ordinary deposits, or that the cross-complainant is entitled to a prior lien on the assets, or to any relief whatever.

The answer further avers, that whatever use was made of said fund by either of the banks, or the firm, was well known to McKendree College, and to the board of church extension; that the latter consented thereto, and acquiesced therein. The answer also sets up *laches*, and the ten year, and five year Statute of Limitations as a defense.

182—6

George W. Brown, in his separate answer, avers, that, at the time of the surrender of its charter the National Bank had a large amount of real estate taken for bad debts, which had depreciated, and that, by reason thereof, the McCurdy stock was not worth $40,000.00; that the charter was surrendered, because the bonds, securing the bank's circulation, were called in for redemption, and it would have been detrimental to buy other bonds on account of the high premium they commanded; that the total amount received on the sale of the bonds when the charter was surrendered was less than $10,000.00; that the organization of said partnership and the continuation of the banking business were what prudent and careful business men would have done; that the college and the board of church extension consented to, and acquiesced in, and ratified the investment of the funds in the co-partnership.

An amendment was filed to the answer of W. M. Fogler to the cross-bill of John Penn, which sets up that, at the February term, 1877, of the circuit court of Fayette county, George W. Brown, administrator, etc., filed a bill for the construction of the will, and for the appointment of a trustee to sell the real estate and carry out the provisions concerning the bank stock; that the college and the church extension society were defendants thereto, and entered their appearances; and that a decree was entered therein on March 10, 1877, the substance of which is set out in the opinion.

Upon the hearing of the case, the court below made a final decree, sustaining the investment made by Brown in the partnership, known as the "Bank of Vandalia," and, in general, denying the relief prayed for in the cross-bill. By the terms of the final decree, it was ordered that the receiver proceed to execute the decree under which he was appointed; that, out of the assets in his hands, or to come into his hands, he should first pay the costs of the receivership, and next the creditors of the firm in

full; that, after such indebtedness is paid in full, he shall deliver to John Penn, trustee, two-fifths of the remaining assets, and to each of the remaining complainants in the bill, except Brown, their ratable proportion according to their respective interests; and that the receiver should pay all the costs of this proceeding.    The complainants in the cross-bill of John Penn, trustee, excepted to the decree.

A writ of error was sued out from the Appellate Court to review the decree so entered by the circuit court; and the Appellate Court affirmed the decree of the circuit court.  The present appeal is prosecuted from such judgment of affirmance entered by the Appellate Court.

The will of Nathaniel M. McCurdy, above referred to, is as follows:

"I, Nathaniel Masters McCurdy, of the city of Vandalia and county of Fayette, in the State of Illinois, being in good health and of sound and disposing mind and memory, calling to mind the uncertainty of life, and in view of a contemplated excursion through the Lake Superior, beset, as it must be, with dangers of both waters and land, and being desirous of so disposing of the little property with which a kind Providence has intrusted to my hands as to avoid litigation and waste, that it may be the source of the greatest good to others, I make and publish this my last will and testament, hereby revoking and making null and void all other wills and testaments by me heretofore made.

"And first, I desire and direct that my mortal body, wheresoever it may be that the immortal spirit departs therefrom, shall be transported to the vault prepared for the purpose near the McCurdy M. E. Church, in the city of Vandalia, in the State of Illinois, and placed by the side of the remains of my deceased wife, and that my epitaph be cut upon the same stone as that of my departed wife.    And that there may be a legal as well as a moral obligation resting upon the trustees and society of the

McCurdy M. E. Church to respect the repository of the dust of myself and deceased wife, by keeping the tomb in decent repair and good condition, I give, devise and bequeath to the said trustees and their successors in office $3000.00 in cash, to be continually invested so as to realize therefrom the highest legal interest, to be regularly paid semi-annually, and such interest invested in—first, the premium on insurance against loss by fire, and to be kept unremittingly effective on an amount not less than $12,000.00, embracing the parsonage, as well as the church; secondly, the purchase and hanging a bell in the place where now hangs the bell I bought for that church sold to Michael Lynch, and which bell may now be sold to pay in part for the new bell under contemplation, which new bell shall weigh not less than twelve hundred pounds, and as much more as the trustees may think the church steeple is capable of sustaining; thirdly, the placing of a good and substantial iron fence in front of and on the two sides of the church lot, including the tomb or vault; fourthly, the roofing of the entire church and parsonage with slate as soon as the accruing interest will admit of the payment for these enumerated objects, and until then the interest is not to be expended for any other purpose whatever, but after these objects are procured and paid for, the balance of accruing interest forever shall be applied to the repairs of the church and parsonage, and the tomb, as occasion may require. If the lot on which stands the tomb should ever be sold, it can only be done in accordance with a provision of the discipline of the M. E. church, which requires the proceeds of such sale to be re-invested in another lot and church, and in such case I demand and require that my tomb shall be removed to the new lot and re-erected thereon, and preserved and taken care of as I expect and require to be done on the lot where it now stands; and as an evidence that the trustees of the church, for themselves and their successors in office, fully agree to perform the above re-

quirements, they accept the $3000.00 with the conditions annexed. The $3000.00 shall be paid by my executors hereinafter to be named as soon after my decease as they may be able to discharge all other bequests I make in this will, out of my dividends on my bank stock in the National Bank of Vandalia.

"Also I give and bequeath unto my sister, Mary K. Marr, now of Portland, State of Maine, $3000.00 annually out of dividends to be made on the earnings of my shares of stock of the N. B. of V., or semi-annually, if so preferred by the bank, beginning as soon after my decease as may be convenient and continued as long as she may live, which cannot, in the common course of nature, be long, and after her death the same to be divided between her two daughters, Imogene Marr and Harrietta Marr, as long as they may both live. At the death of either let the same be paid to the survivor as long as said survivor shall live, at the death of whom it shall cease.

"The means to meet and discharge all the legacies in this will hitherto devised will be found in the earnings of my bank stock, and when they are all fully discharged I hereby will, bequeath and devise unto the proper government of McKendree College, for the use and behoof of said college, to endow and support and maintain and continue in use a professional chair, to be known as the 'McCurdy Professorship of the Pure and Applied Sciences,' two hundred shares, of $100.00 each, to be transferred on the books of the National Bank of Vandalia to the credit of said McKendree College, the earnings of which shall be appropriated exclusively to the salary of the professor and the purchase of apparatus for use of such chair, in such proportions as the government of the college may agree upon. The said stock shall ever be considered as a perpetual endowment of said professorship and no part thereof shall ever be diverted to any other use, but it shall be kept upon the best interest obtainable, and the interest alone annually expended.

After the transfer of stock to the college or its author-
ized agent is made, and the college becomes the legal
proprietor of that amount of capital stock, it, the college,
will be entitled to a participancy in the management of
the National Bank of Vandalia, and may continue so or
sell out the stock and invest elsewhere, as they may de-
termine for the benefit of the endowment, but as the con-
dition of things now is I would advise that it be kept as
stock in the bank so long as the bank may hold an exist-
ence as such, and then seek other investment.

"I also give, devise and bequeath to the Church Ex-
tension Society of the Methodist Episcopal Church, a body
corporate under the laws of the State of Pennsylvania,
(the corporate name of the society may at this writing
be somewhat changed, but let it be understood that I
mean the society once known by the above title,) two
hundred shares of the capital stock of the National Bank
of Vandalia, together with all the rights and privileges
thereunto belonging or in any way appertaining; and as
it is but a natural desire on the part of most men to have
kept alive the name and remembrance of departed loved
ones, and that it may induce others to follow my exam-
ple, I make it a condition in receiving this legacy on the
part of the church extension society that it shall ever be
known, in both law and equity, as the 'McCurdy Fund for
Church Extension.'

"I also will and ordain that my executors shall on the
best terms they can make, and within a reasonable time
after my death, sell all the property, real, personal and
mixed, of which I may die seized and possessed or to
which I may be entitled to at the time of my decease, and
the avails of such sale, after all expenses and charges
shall be fully met and all just demands against my as-
sets are discharged and paid, and the money received
kept on interest when the amount is too small to meet a
legacy, shall be divided and paid over to the proper per-
sons authorized to receive the same, as follows: To the

Fayette County Bible Society, of which I acted as secretary for twenty years, $300.00; to the sisters Imogene and Harrietta Marr, both of Portland, Maine, $3000.00 each if both shall be living at the time when the money may be ready for distribution, if one should be dead the survivor shall be entitled to receive the share of the other; and to Elizabeth Pingree, also of Portland, Maine, $3000.00; and to Mrs. Eliza Watson, now of Cairo, in Illinois, $1000.00; and to the four daughters of Samuel Mc-Curdy, all of Augusta, State of Arkansas, $1000.00 each if all shall be alive, if one or more be dead the whole to go to the survivors in equal proportions. And all the rest, residue and remainder of my estate and effects, whether personal, real or mixed, whatsoever and wheresoever, not herein before otherwise effectually disposed of, I do give, devise and bequeath unto the missionary society of the Methodist Episcopal Church."

Merrills & Mooneyham, and G. A. Koerner, for appellants:

The will specifically designates the property impressed with the trust, and expressly names the objects and purposes of the trust and the persons to be benefited thereby. It is therefore an express trust. Perry on Trusts, (3d ed.) sec. 24.

There is a distinction between a testamentary trustee and an executor. Where a testator appoints his executor as trustee, it is as if different persons had been appointed to each office. Perry on Trusts, (4th ed.) sec. 281; *Lindley* v. *O'Reilly*, 1 L. R. A. 79; *In re Estate of Higgins*, 28 id. 116.

Where a testator devised to his daughter one-half of his estate and directed his executors to put it on interest and pay her the proceeds, it was held that an administrator *de bonis non* with the will annexed did not succeed as trustee. *Shaw* v. *McCameron*, 11 S. & R. 252.

An administrator with the will annexed only has the powers of an executor *virtute officii*, and has no authority

over trusts created by the will. *Hall* v. *Irwin*, 2 Gilm. 176; *Nicoll* v. *Scott*, 99 Ill. 537; *Conklin* v. *Edgerton's Admrs.* 21 Wend. 423; *Mott* v. *Ackermann*, 92 N. Y. 349; *Knight* v. *Loomis*, 30 Me. 204; *Shaw* v. *McCameron*, 11 S. & R. 252.

The powers and duties not necessarily connected with the functions of an executor devolve upon the administrator with the will annexed only when it appears clearly from the will that the testator so intended. 1 Woerner on Administration, sec. 178; *Knight* v. *Loomis,* 30 Me. 204; *Conklin* v. *Edgerton's Admrs.* 21 Wend. 423; *Tainter* v. *Clark*, 13 Metc. 229; *Ingle* v. *Jones*, 9 Wall. 486.

Where the testator vests the office of executor and the office of testamentary trustee in the same person, it is the duty of the appointee to qualify in each capacity by taking credentials for each office, as executor from the probate court and as trustee from a court of equity. Schouler on Executors, sec. 485; *In re Estate of Higgins*, 28 L. R. A. 126; *Newcomb* v. *Williams*, 9 Metc. 525.

A person may become a trustee by intermeddling with and assuming the management of trust property without authority. Such persons are trustees *de son tort.* Perry on Trusts, (3d ed.) secs. 245, 265; *Piper* v. *Hoard*, 107 N. Y. 73; *Morris* v. *Joseph*, 1 W. Va. 256.

During the possession and management by such constructive trustees they are subject to the same rules and remedies as other trustees. They cannot avoid liability by showing they were not in fact trustees, neither can they set up the Statute of Limitations. Perry on Trusts, (3d ed.) sec. 245; *Rackham* v. *Siddall*, 1 Mac. & G. 607.

When a liability arises from an intentional wrongful act of several parties conspiring together, each is liable for resultant damage. *Farwell* v. *Telegraph Co.* 161 Ill. 600.

If a partner uses trust money in the partnership business with the knowledge of the firm, the firm will be liable and must answer for the breach of trust committed by the co-partner. *Englar* v. *Offut*, 70 Md. 78; *Ex parte Apsley*, 3 Bro. C. C. 265; *Ex parte Watson*, 2 V. & B. 415;

Story on Partnership, sec. 368; Lindley on Partnership, (5th ed.) 161; *Smith* v. *Jameson*, 5 T. R. 599.

When a partnership is a party to a breach of trust it is liable to an accounting. (*Wilson* v. *Moore*, 1 M. & K. 127.) Especially so if the fund is used as firm assets. *Durant* v. *Rogers*, 87 Ill. 508; *Stokes* v. *Little*, 65 Ill. App. 255.

Members of a joint stock company are liable as partners. Where there have been changes in such a firm the new partners are liable for the debts. *Wadsworth* v. *Duncan*, 164 Ill. 360; *Wadsworth* v. *Laurie*, id. 42.

The equitable owner of a trust fund invested in such a partnership cannot be deemed a partner, where such investment was made without his knowledge and the affairs of the firm managed without his participation. *Wadsworth* v. *Duncan*, 164 Ill. 360.

Unless there is some express direction in the instrument creating the trust, trust funds must be invested in government or real estate securities. *King* v. *Talbot*, 40 N. Y. 76; *Simmons* v. *Oliver*, 74 Wis. 633; 2 Pomeroy's Eq. Jur. sec. 1074; *Gray* v. *Fox*, 1 N. J. Eq. 259; *White* v. *Sherman*, 168 Ill. 602.

Where the intention of the testator is that the *corpus* of the fund should be preserved in its integrity, and in that state go over to another after the death of the annuitant, it cannot be called upon to make up any deficiency of annuities. *Einbecker* v. *Einbecker*, 162 Ill. 267.

In order that the *cestui que trust* may be bound by acquiescence there must be on his part a full knowledge of all the facts and circumstances. A remainder-man cannot acquiesce until his interest falls into possession. (Perry on Trusts,—3d ed.—sec. 467.) And he must also be apprised of his or her legal rights in the premises. *Adair* v. *Brimmer*, 74 N. Y. 539.

Acquiescence of a party under ignorance of his rights will not operate as a waiver. The burden of proof of such ignorance is not upon the party against whom such acquiescence is alleged. *Bennett* v. *Colley*, 2 M. & K. 232.

Acquiescence will not be presumed from mere lapse of time if the *cestui que trust* has done nothing to acknowledge it or has received no benefit. (*Phillipson* v. *Gatty,* 7 Hare, 516.) Neither can it be inferred until the *cestui que trust* has actual knowledge of the breach, for the reason that it is the duty of the trustee to execute the trust and not the duty of the *cestui que trust* to make inquiries. *Thompson* v. *Finch,* 22 Beav. 325; Perry on Trusts, (3d ed.) sec. 850.

Constructive trustees or trustees *de son tort* cannot plead the Statute of Limitations. *Rackham* v. *Siddall,* 1 Mac. & G. 607; Perry on Trusts, (3d ed.) sec. 245.

PATTON, HAMILTON & PATTON, for appellees:

Brown, as administrator with the will annexed, had the power and authority, as such administrator, to manage and control the bank stock so as to produce the dividends with which to pay the annuities. 1 Williams on Executors, (7th Am. ed.) 563, 564; *Hall* v. *Cushing,* 9 Pick. 395; 1 Woerner on Administration, secs. 178, 245; *Buttrick Am.* v. *King,* 7 Metc. 20; *Knight* v. *Loomis,* 30 Me. 209; *Blake* v. *Dexter,* 12 Cush. 559; *Dorr* v. *Wainwright,* 13 Pick. 328; *DePeyster* v. *Clendening,* 8 Paige, 311; *Farwell* v. *Jacobs,* 4 Mass. 634.

In the management of personal property and trusts in relation to the payment of legacies from personal property or its earnings, all the duties of an executor which rest upon him by virtue of his office devolve upon the administrator with the will annexed, unless it appears from the will that such duties were cast upon the executor by reason of personal trust and confidence. 1 Woerner on Administration, sec. 178; *Leslie* v. *Moser,* 163 Ill. 502; *Hall* v. *Cushing,* 9 Pick. 395.

The doctrine that the duties cast upon the executor do not devolve upon the administrator with the will annexed has application only to a case where real estate is to be sold. This position is most clearly supported by

the cases of *Hall* v. *Irwin*, 2 Gilm. 176, and *Conklin* v. *Edgerton's Admrs.* 21 Wend. 431.

An administrator with the will annexed is authorized to apply to a court of equity to have a trustee appointed to make sale of lands, although perhaps not bound to do so. *Wenner* v. *Thornton*, 98 Ill. 156.

A partner is not liable because he is a member of a firm in which trust funds are improperly used, but because he knows of such breach of trust and consents to it. 1 Bates on Partnership, sec. 481.

To render a partner liable to restore or pay the value of the property, the use made of it by the executor must have been wrongful, and known by the other partners to have been wrongful. 1 Bates on Partnership, sec. 481.

The *cestui que trust* may elect whether he will ratify or disaffirm the use of the trust fund. He cannot do both at once. 2 Beach on Trustees, sec. 550; 27 Am. & Eng. Ency. of Law, 261.

One paying money to a trustee is not responsible for the misapplication of it. *Keane* v. *Roberts*, 4 Mad. Ch. 357; *Oglesby* v. *Foley*, 153 Ill. 19; *Bank* v. *Hyde Park*, 101 id. 595.

If the partners with Brown could be held to be trustees it could only be by operation of law, and they would be implied trustees. In that case the Statute of Limitations runs. *Kane* v. *Bloodgood*, 7 Johns. Ch. 90; 27 Am. & Eng. Ency. of Law, pp. 100, 101, and note 3 to p. 101; *McLaflin* v. *Jones*, 155 Ill. 543; Buswell on Limitations, sec. 340; *Herr* v. *Payson*, 157 Ill. 244.

A new partner is not liable for former conversion of a trust fund to a partnership fund. 17 Am. & Eng. Ency. of Law, 1071, 1115, 1117; 27 id. 264; *Gunnell* v. *Cockerill*, 79 Ill. 79.

An incoming partner is not liable for debts of the old firm unless he expressly assumes them. *Mellor* v. *Lawyer*, 55 Ill. App. 679; *Wright* v. *Brosseau*, 73 Ill. 331; 16 Am. & Eng. Ency. of Law, 900, 905-907; 1 Lindley on Partnership, 206.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

*First*—The will, in this case, appointed no executor or trustee. George W. Brown, who was then cashier of the National Bank of Vandalia, was appointed by the county court of Fayette county administrator with the will annexed of the estate of Nathaniel M. McCurdy, deceased, and filed his inventory, as such administrator, on January 8, 1877. The estate has not yet been settled by the county court. At the February term, 1877, of the circuit court of Fayette county, George W. Brown filed a bill, and, in the suit commenced by the filing of said bill, the decree of March 10, 1877, was entered. The bill itself and other papers in the case have been lost, and there is some dispute between the parties as to the contents of the bill, and as to the object sought by it. The appellees claim, that the object of the bill was to construe the will and determine the powers of Brown under it to conduct the business, including the bank stock. The appellants claim, that the bill merely asked for authority to sell real estate. Without deciding what was the real character of the bill, we will confine ourselves to the language and finding of the decree of March 10, 1877.

Counsel on both sides, discuss the question, whether the administrator *cum testamento annexo* had the power to execute and carry out the provisions of the will in regard to the four hundred shares of bank stock. Executors are often required by the terms of the will, appointing them, to act in a double capacity: *first*, as executors by virtue of their office; and, *second*, as agents or trustees under a warrant of attorney. An executor is often charged, not only with the duties and liabilities appertaining to that office, but also with certain duties in the execution of a trust, which is imposed upon him by the will. The general rule is, that the duties and powers of an executor, which result from the nature of his office as executor, devolve

upon the administrator with the will annexed. But the
duties and powers, which are imposed upon an execu-
tor as a trustee, are in the nature of a personal trust or
confidence reposed in him by the executor, and do not
devolve upon the administrator with the will annexed,
inasmuch as they cannot be delegated. (*Hall* v. *Irwin*, 2
Gilm. 176; *Nicoll* v. *Scott*, 99 Ill. 529).

It is clear, therefore, that George W. Brown, acting
under his appointment as administrator with the will
annexed as made by the county court, would have had
no power to take upon himself the execution of the trust
in regard to the bank stock. The question then arises,
whether such power was conferred upon him by the de-
cree of the circuit court of Fayette county, rendered on
March 10, 1877, in the proceedings brought therein by the
filing of the bill by Brown against the life annuitants,
Mary A. Marr, Harrietta Marr, and Imogene Marr, and
the remainder-men, or those entitled to take after the
death of the annuitants, to-wit: McKendree College and
the Church Extension Society of the Methodist Episcopal
Church. Brown had the right, as administrator with the
will annexed, to apply to a court, having equitable juris-
diction, to have a trustee appointed to carry out those
provisions of the will, which did not strictly devolve upon
him as such administrator. (*Wenner* v. *Thornton*, 98 Ill. 156).

The decree of March 10, 1877, did not give a definite
construction of the will, so far as it related to the duties
of the executor or trustee in relation to the bank stock.
It will appear from the findings of the decree, as set
forth in the reciting part thereof, that the object of the
bill, upon which the decree was founded, was to get the
permission of a court of chancery to sell the real and
personal property of the estate. The decree finds, that
the legatees in the will of Nathaniel M. McCurdy, de-
ceased, were the Marrs, and the college, and the church
extension society above named; that said McCurdy left
a large amount of real and personal estate, which had

been inventoried, and reported to the county court by Brown, but that no executors were named in the will; and the finding portion of the decree then proceeds as follows: "And it further appearing, that said testator desired all of his real and personal property sold, conveyed, or transferred, to enable the specified legacies to be discharged, and of said personal estate there are four hundred shares of bank stock in the National Bank of Vandalia, valued at $100.00 a share, and the following described real estate, to-wit: (here follows description of real estate)." The ordering part of the decree is that Brown, the administrator with the will annexed, "transfer and dispose of said bank stock as in said will specified, and that it be so transferred and disposed of for the uses and purposes in said will mentioned; and that said administrator is hereby fully authorized and empowered to sell all the other property of Nathaniel M. McCurdy, deceased, including real estate, personal and mixed property, and to collect what is due said estate, and to disburse the same as directed by said will; that said real, personal and mixed property may be sold, * * * and said complainant (Brown) shall have generally all the powers, rights, duties, and authority that an executor could or might have, if named and mentioned in said will, and said administrator shall report all his actions and doings to the county court of said Fayette county, as provided by law in reference to administrators."

It is claimed by the appellees that, inasmuch as the decree gave Brown generally "all the powers, rights, duties, and authority that an executor could or might have, if named and mentioned in said will," Brown was thereby clothed with power to manage the bank stock in accordance with the terms of the will. But it was expressly held by this court in *Hall* v. *Irwin, supra,* that those words did not confer upon an administrator *cum testamento annexo* the right to exercise the trust powers conferred upon an executor, but only the powers appertaining strictly

to his office as executor. In *Hall* v. *Irwin, supra,* the case of *Conklin* v. *Edgerton's Admr.* 21 Wend. 430,—where words in a New York statute, precisely similar to the words used in this decree, were construed as being limited to duties belonging properly to the office of executor, and as not extending to anything to be done by the executor as trustee,—was approved by this court. Counsel for appellees insist, that the case of *Conklin* v. *Edgerton's Admr. supra,* has been since modified, if not overruled, by a subsequent decision made by the New York court of appeals. But we consider ourselves bound by the doctrine announced in *Hall* v. *Irwin, supra,* because the case of *Hall* v. *Irwin* was subsequently endorsed and approved by this court in *Nicoll* v. *Scott, supra.*

That the provision in the decree, which gave Brown the powers, rights, duties, and authority that an executor could or might have if one had been named in the will, did not confer upon him any other powers than those strictly appertaining to the nature of his office as executor, is apparent from the requirement, that he shall report all his actions and doings to the county court, as provided by the law in reference to administrators. Section 112 of the Illinois Administration act provides, that executors and administrators shall exhibit their accounts for settlement to the county court at the first term after the expiration of one year after the date of their appointment, and in like manner every twelve months thereafter. If the decree was intended to make Brown a trustee for the purpose of executing the trust in regard to the bank stock, and not a mere administrator to discharge the duties of administration, it would seem that he should have been required to report to the chancery court, which appointed him. The decree undoubtedly gave him power to sell the land with a view to paying the legacies to be paid out of the proceeds of the sale thereof, but the decree leaves it in doubt what duty was intended to be imposed upon him in relation to the bank stock. He was

merely required to "transfer and dispose of said bank stock as in said will specified," and "for the uses and purposes in said will mentioned." There is nothing in the language of the decree, that necessarily empowered him to hold the stock as administrator with the will annexed, until Mrs. Marr and both her daughters should die, and then transfer it to the college and the church extension society. Such a construction of the decree would give him the right to hold and manage the stock for a long period of years, or until the survivor of the three annuitants should die. The decree, on the contrary, seems to contemplate immediate action; and a fair construction of it would lead to the conclusion, that it was his duty to have either himself or another person appointed trustee by a court of chancery, and transfer the stock to such trustee.

If the decree did not confer upon Brown, administrator *cum testamento annexo*, the authority to execute the trust in regard to the bank stock, his acts in so doing constituted him a constructive trustee, or a trustee *de son tort.* Where one without authority undertakes to execute a trust, requiring the investment of a fund, he must himself carry all the risks, and make good all the losses, and have none of the profits, and his co-investors are equally liable. "A person may become a trustee by construction by intermeddling with and assuming the management of trust property without authority. Such persons are trustees *de son tort.*" (Perry on Trusts,—3d ed.—sec. 245; *Morris* v. *Joseph,* 1 W.Va. 256; *Piper* v. *Hoard,* 107 N.Y. 73). "During the possession and management by such constructive trustees, they are subject to the same rules and remedies as other trustees; and they cannot avoid their liability by showing that they were not, in fact, trustees, nor can they set up the Statute of Limitations." (Perry on Trusts,—3d ed.—sec. 245).

*Second*—But, for the purposes of this case, it may be conceded that Brown had authority, under the terms of

the decree, to manage the trust in regard to the bank stock. Did he do his duty as trustee, if he had the authority of a trustee in the management and investment of the trust fund in his hands?

The testator, Nathaniel M. McCurdy, owned four hundred shares of stock in the National Bank of Vandalia, each share being $100.00, and the whole amounting to $40,000.00. At the time of his death on September 29, 1876, this stock had a par value of $100.00 per share, and was worth more than par. The shares were probably at the time at a premium. By the terms of his will he gave to his sister, Mary K. Marr, $3000.00 annually out of the dividends to be made out of the earnings on these shares of stock, to be continued during her life, and after her death, the same to be divided between her two daughters, Imogene and Harrietta Marr, as long as they might both live; at the death of either, the same to be paid to the survivor as long as the latter should live. By the terms of the will, after the legacies charged against the bank stock should be paid, the testator bequeathed and devised to McKendree College two hundred shares of the stock, to be transferred on the books of the National Bank of Vandalia to the credit of said college; and two hundred shares of said stock to the Board of Extension of the Methodist Episcopal Church, a corporation organized under the laws of Pennsylvania.

When Brown was appointed administrator with the will annexed, he took possession of these four hundred shares of bank stock; represented it at the meeting of the directors and stockholders of the bank; collected the dividends thereon; paid the legacies to the Methodist Episcopal Church in Vandalia, and paid the annuities up to the time of the surrender of the bank's charter, as hereinafter stated.

The National Bank of Vandalia did business as such until the first day of April, 1883. At the latter date the National Bank surrendered its charter, pursuant to a reso-

182—7

lution adopted by its stockholders on January 11, 1883. That bank did no further business after April 3, 1883. The reason assigned for the surrender of its charter was, that the government bonds, pledged to secure its circulating currency or bills, had matured, and were called in for redemption; and that the premium on bonds, which could then be purchased to be substituted for those retired, was twenty-eight per cent. It is said that, in view of the high premium which it was necessary to pay in order to purchase new bonds, it was not for the interest of the stockholders to continue the existence of the bank as a national bank. Accordingly, on April 2, 1883, the stockholders of the National Bank organized a co-partnership under the firm name and style of the "Bank of Vandalia," and continued doing business at the same stand, formerly occupied by the National Bank of Vandalia. The new firm, by the agreement of the parties succeeding to the business of the National Bank, took possession of its assets, and assumed its liabilities. At the time of the surrender aforesaid, Brown, administrator with the will annexed of the estate of Nathaniel M. McCurdy, still had in his hands the four hundred shares of the capital stock of the National Bank of Vandalia. When the new firm was formed under the name of the Bank of Vandalia, he went into said firm as a partner in his capacity as administrator, and permitted the fund, consisting of said four hundred shares of bank stock, to go into the business of the new firm, and to be continued therein as a part of the assets of said firm.

The report of the National Bank of Vandalia, made by Brown to the comptroller of the currency on December 30, 1882, showed the total resources of the bank to be $330,673.96, and the total liabilities to be $190,928.27, leaving the net resources $139,545.69. It is contended by the appellees that, of these resources, about $69,000.00 afterwards proved to be a loss. But the evidence shows that, if such a loss occurred, it could have been avoided

in large part by proper management. The directors and stockholders, who were debtors to the firm, were settled with in such a negligent way as to involve a loss to the firm, and one or more of the stockholders was allowed to withdraw his or her capital to the detriment of the firm.

Whether the reason assigned for surrendering the charter of the National Bank was a good one or not, it was done by a vote of the necessary number of stockholders; and the question arises whether Brown made a proper investment of the funds of the estate, theretofore consisting of the four hundred shares of bank stock, when the surrender took place. The new firm, which was organized under the name of the Bank of Vandalia, was a mere partnership. It was none the less a partnership, because articles of association were entered into. The evidence is clear that Brown invested the trust fund in his hands in the new venture or partnership. The Bank of Vandalia was not subject to the restrictions, which were imposed by act of Congress upon the National Bank of Vandalia. Brown made the investment of the trust fund in the new firm upon his own judgment, and without applying for permission to do so, either to the county court, or to the circuit court. The fund in his hands belonged to McKendree College and the Board of Church Extension of the Methodist Episcopal Church, subject to the rights of Mrs. Marr and her two daughters to receive $3000.00 a year from the income of the fund, so long as any one of them was alive. It was the duty of Brown, as administrator with the will annexed, to protect the principal, or *corpus*, of the fund for the college and board of extension, as only the income thereof was to go to the annuitants, Mrs. Marr and her two daughters. He, however, formed a new firm or organization, and paid out dividends, which trenched upon and depleted the *corpus* of the fund. The law is that, where a monthly or yearly allowance is to be paid from the income of a fund, the *corpus* of the estate cannot be resorted to for the purpose

of making up the accruing deficiencies in the allowance. (*Einbecker* v. *Einbecker*, 162 Ill. 267). The new partnership not only continued the same banking business at the same stand, but substantially with the same capital and the same stockholders, as had been in and connected with the National Bank of Vandalia. The firm, known as the Bank of Vandalia, continued in business up to May 1, 1895, when it ceased to do business, and a new bank was organized and called the First National Bank of Vandalia. Brown was cashier of the National Bank of Vandalia from some time in 1866, soon after its organization, down to the surrender of its charter in April, 1883. He was also cashier of the partnership, known as the Bank of Vandalia, and also became cashier of the First National Bank of Vandalia. It does not appear, that any of the trust fund in question went into the latter bank, which was organized with a capital stock of $50,000.00. The capital stock of the National Bank of Vandalia was $100,000.00, and the same amount was invested in the new firm, known as the Bank of Vandalia. The interest of the McCurdy estate in the National Bank of Vandalia was $40,000.00, or two-fifths of its capital stock, and it had the same interest in the capital invested in the new firm.

Brown was required by the decree of March 10, 1877, to report his actions and doings to the county court of Fayette county. He made three reports; the first one was filed March 8, 1879, and covered the period from November 30, 1876, to March 8, 1879. In this first report, he charges himself with a balance of $50,471.50, and says, "included in the above balance is $40,000.00 bank stock." In this report he also charges himself with dividends on the bank stock. In the report he charges himself with items of receipts, embracing personal property which includes the bank stock, and refers to this personal property as being embraced in the inventory filed by him in the county court. The inventory describes the bank stock

as follows: "Four hundred shares in the National Bank of Vandalia at $100.00 per share, par value $40,000.00." His second report is dated March 17, 1884, and embraces the period from March 8, 1879, to February 18, 1884. It will be observed, that a part of the time, embraced in the latter period, was after the surrender of the charter of the National Bank, which took place in April, 1883. In this report he says nothing about the surrender of the charter of the National Bank, and nothing about the formation of a new partnership, known as the Bank of Vandalia, nor anything about his investments of the trust funds in said partnership. On the contrary, he uses the following words: "Balance due, being bank stock held in trust, $40,000.00." He also refers to the annuities paid Imogene and Harrietta Marr. At the time this report was made, there was really no bank stock existing in the National Bank of Vandalia, because that bank had gone out of existence in April, 1883. Whatever stock then existed was stock in the Bank of Vandalia, or rather a two-fifths interest in the partnership doing business under that name. The report, however, treats the bank stock, as though it was still existing in the National Bank of Vandalia. The report, taken in connection with the previous report, and the inventory referred to therein, can have no other interpretation than that of describing the four hundred shares of National Bank stock as still existing. There was nothing in the report to inform the county court that the stock in his hands was not National Bank stock. The report was calculated to deceive the court as to the character of the investment; and the author of the report must be held to have intended to make the impression, which the language of the report creates. The third report made by Brown was filed in March, 1896, and covers the period from February 18, 1884, to February 18, 1896, twelve years. In this third report he mentions, among the items of receipts, the following: "February 12, 1884, four hundred shares bank

stock par value, $100.00 each, $40,000.00." References
are made to dividends on the bank stock, and to items
paid out to Imogene and Harrietta Marr. The report
asked the court to reduce the rate of interest to be paid
to the annuitants from ten per cent per annum to four
per cent per annum, and refers to his compensation, using
the following words: "Until the conditions requiring the
transfer of the bank stock to the final purpose intended
by the deceased, viz.: to the McKendree College and the
Extension Society of the Methodist Episcopal Church."
This third report makes no mention of the formation
of the new firm, and refers to a contemplated transfer of
bank stock at some time in the future to McKendree Col-
lege and the board of church extension. It is true that,
in the last sentence of the report, the following words
occur: "The four hundred shares of bank stock in the
Bank of Vandalia at $100.00 per share, total principal
$40,000.00 held in trust as administrator with the will
annexed." No provision was made in the will for the
transfer of any stock except national bank stock, and
such transfer was to be made upon the books of the
National Bank of Vandalia. When the third report was
made, the National Bank of Vandalia had long since
gone out of existence, and no transfer of stock could ever
be made upon its books. No transfer of stock was di-
rected by the will to be made upon the books of the Bank
of Vandalia. It follows that the report was misleading,
and although the words, "Bank of Vandalia," were used
in the last sentence of the report, all the language taken
together was calculated to make the impression upon the
county court, that the administrator was dealing with
the same stock, which was referred to in the will, and
which had been mentioned in his former reports. The
conclusion is inevitable, that this administrator with the
will annexed not only failed to ask the advice of any
court as to the investment of the trust funds in his hands
in the new partnership venture, but that he sedulously

concealed from the court the fact that he had made such investment after it was made.

Under the law, Brown, as administrator with the will annexed, holding this bank stock in trust, had no power or authority to invest it or the proceeds of its sale, if it had been sold, in the new partnership. The evidence is clear that he did so invest it, and that he put it into the partnership, as trust funds in his hands as administrator with the will annexed. A trustee will not be protected from loss in investing trust funds, unless he invests in government or real estate securities, or other securities approved by the court, to which he is accountable. (*Simmons* v. *Oliver*, 74 Wis. 633). A trustee should not invest the money of others in his care in the stock or shares of any private corporation, nor has he any right to employ trust funds in a private business, and thereby subject them to the fluctuations of trade, even though such investment is approved of by his own judgment, and is made with honest intent. It is the duty of a trustee to make investments of trust funds in real estate securities or government securities, whether of the national or State government, or, if he is acting under the direction of a court, to select such securities as the court approves of. (11 Am. & Eng. Ency. of Law, pp. 819, 835; *Grey* v. *Fox*, 1 N. J. Eq. 259; *White* v. *Sherman*, 168 Ill. 589; *Mattock* v. *Moulton*, 84 Me. 545; *King* v. *Talbot*, 40 N. Y. 76; 2 Pomeroy's Eq. Jur. sec. 1074). In *King* v. *Talbot, supra*, the court said: "It is not denied that the employment of the fund as capital in trade would be a clear departure from the duty of trustees. If it cannot be so employed under the management of a co-partnership, I see no reason for saying that the incorporation of the partners tends in any degree to justify it."

It is claimed that, by making an investment of the trust fund in the partnership formed under the name of the Bank of Vandalia, it was continued as an investment in the banking business, and that the testator in his will

showed a preference for an investment in bank stock. The will, however, shows a preference on the part of the testator for an investment in the stock of a national bank, and not in the stock of a private bank. He says in his will: "I would advise, that it be kept as stock in the bank so long as the bank may hold an existence as such, and then seek other investment." This language refers to stock in a bank so long as it should exist as a national bank, subject to such examinations and other restrictions as are imposed by the National Banking law. There is nothing in the will to indicate, that the testator ever intended the investment to be changed from one in the national bank to one in the stock or shares of a private banking partnership. Changes in investments, or re-investments, should not be made by trustees as a general thing, unless they are ordered by a chancery court; and, in such case, the trust fund may be withdrawn and re-loaned. (11 Am. & Eng. Ency. of Law, p. 824). It is not claimed, that the Bank of Vandalia was organized under any private banking charter, granted by the legislature before the present constitution was adopted; and the present act, permitting the organization of corporations with banking powers, did not exist in April, 1883, when the firm, known as the Bank of Vandalia, was formed; that act was not adopted until 1887.

*Third*—The question arises as to the liability of those who were partners with Brown in the firm, known as the Bank of Vandalia. They are called stockholders, but it is apparent that they were mere partners. When the firm, known as the Bank of Vandalia, was dissolved on May 1, 1895, George W. Brown, as administrator with the will annexed of the McCurdy estate, owned an interest of two-fifths, or $40,000.00 in the firm; and other parties, whose names appear in the record, owned the other interest of three-fifths in various amounts, ranging all the way from $15,000.00 to $500.00. From the time when the firm was organized up to the time of its dissolution, a few

changes in the stockholders took place, through death, and, in three instances, through transfers of stock.

Where a partner, who is a trustee or executor, improperly employs the money of his *cestui que trust* in the partnership business, or in the payment of partnership debts, the *cestui que trust* will be entitled to re-imbursement by the firm, if the other partners have knowledge of the nature of the fund at the time of the misapplication. The other partners, at the election of the *cestui que trust*, are placed with the misappropriating partner in the attitude of trustees of the fund; and they are regarded as having connived at the violation of the trust. If they know that the fund belongs to an estate, they are bound to inquire upon what terms it is held. The liability, when incurred, is a joint and several one. (17 Am. & Eng. Ency. of Law, pp. 1071, 1072).

The rule is thus stated by Story in his work on Partnership (5th ed. sec. 368): "If one partner is separately entrusted with trust money, and he, with the knowledge and consent of his partners, applies it to partnership purposes, it will constitute a joint debt against the partnership at the election of the *cestui que trust* or beneficiary." (See also Parsons on Partnership,—4th ed.—sec. 104). Where all the partners know that the fund invested is trust money, they are implicated in the breach of trust. If they know that such money is being employed in the partnership business for the common benefit, they will all be bound for the money so employed, and be made answerable for the breach of trust committed by their copartner with their acquiescence. (*Englar* v. *Offutt, Trustee*, 70 Md. 78). Bates in his work on the Law of Partnership, (vol. 1. secs. 481, 483,) thus lays down the rule: "If a partner has possession of the funds of others in trust * * * and improperly uses the trust funds for the benefit of the firm, the nature of the co-partners' liability depends on whether they participated in the breach of trust. * * * But if the other partners have knowledge of the nature of

the funds at the time of such misappropriation, they are
implicated in the breach of trust, and become themselves,
at the election of the *cestui que trust*, his debtors, or even
trustees of the fund, as having connived at the violation."
(1 Lindley on Partnership,—5th ed.—pp. 161, 162; *Jaques*
v. *Marquand*, 6 Cow. 497; *Hutchinson* v. *Smith*, 7 Paige Ch.
26; *Guillon* v. *Peterson*, 89 Pa. St. 163; *Emerson* v. *Durand*,
54 Wis. 111; *Durant* v. *Rogers*, 87 Ill. 508; *Renfrow* v. *Pearce*,
68 id. 125).

The evidence is clear to the effect, that all the part-
ners or stockholders in the partnership known as the
Bank of Vandalia, had notice of the fact that Brown held
the funds in his hands as administrator with the will an-
nexed of the McCurdy estate; and that he invested the
trust funds in the business of the new firm; therefore,
these other partners are brought within the scope of the
liability announced in the foregoing authorities. The
other partners, in the accounting which is to take place
when the case goes back, shall be charged with the value
of the interest belonging to the estate of the deceased tes-
tator which had been represented by four hundred shares
of National Bank stock before April 2, 1883, as such value
existed when the new partnership was formed. When
the new firm was formed in April, 1883, W. M. Fogler
owned $5000.00 of the stock, and Mary I. Henninger owned
$2000.00 of the stock. On January 14, 1892, Mary I. Hen-
ninger transferred $500.00 of her stock to W. M. Farmer,
and $500.00 thereof to J. J. Brown, and on March 5, 1892,
W. M. Fogler transferred $4000.00 of his stock to Mary
Wagner. The rule, announced in some of the text books,
that, where the misuse of the trust funds has taken place
before the admission of a partner into the firm, he will
not be liable because not a participator in the mis-use,
is invoked in behalf of these transferees. This rule is
based upon the case of *Twyford* v. *Trail*, 7 Sim. 92. The
examination, however, of the facts of that case will show
that, at a certain date, two persons were admitted as

partners into a firm, and knew that certain trust money remained in the firm, but they afterwards retired, and other partners were admitted, and, upon the failure of the firm, these two persons were held not to be responsible for the breach of trust committed by their co-partners.   No such state of facts exists in the case at bar. W. M. Farmer and J. J. Brown and Mrs. Wagner acquired their interests in the firm in 1892.   The firm continued to do business thereafter for three years, and these transferees remained in the firm during that time.   They did not retire from the firm to be succeeded by other partners, as was the case of the partners held not to be liable in *Twyford* v. *Trail, supra.*   Farmer and J. J. Brown, as we understand the record, were lawyers, who had been consulted by G. W. Brown during his administration of the estate.   Mrs. Wagner and J. J. Brown and Farmer knew that the funds, which George W. Brown had put into the firm, were trust funds.   Those funds were used for the benefit of the firm during the three years following their entrance into it.   It cannot be said of them that they were not participators in the mis-use of the trust funds.   The liability of the firm to these beneficiaries, the McKendree College and the board of church extension, and the daughters of Mrs. Marr, existed when the new partners came into the firm, and continued to exist thereafter.   The incoming partners should not be chargeable with liabilities for the violation of the trust which occurred before they became members of the firm, but the partners, who sold to them their interests, are to remain affected with such liabilities to the extent of their interests so sold.

*Fourth*—It is claimed by appellees, that the cross-bill does not contain such allegations as are sufficient to authorize an inquiry into the mismanagement of the trust fund by the partnership.   We think that the bill is sufficient to authorize the granting of the relief asked for by it.   It is a bill for account and relief.   It traces the trust

fund into the hands of defendants, and avers that "the trust fund and interest thereon is a liability of the partnership." It charges that the defendants should, "in equity and good conscience be held to account to your orator for the said sum of $40,000.00, so received by defendants as aforesaid." It is not necessary in a bill to charge all the circumstances, which may conduce to prove the general charge, for these circumstances are matters of evidence. This is especially true where the circumstances are of such a nature as to be peculiarly within the knowledge of the defendants, as was the case here. When the relief granted is not repugnant to the facts alleged and proved, it is properly granted, although not specifically prayed for under the prayer for general relief. (Story's Eq. Pl. sec. 28; *Stanley* v. *Valentine,* 79 Ill. 544; *Pope* v. *Leonard,* 115 Mass. 286; *Hopkins* v. *Snedaker,* 71 Ill. 449). Moreover, the defendants here did not challenge the sufficiency of the cross-bill by a demurrer, nor did they make any motion to make its allegations more specific. Nor did they raise the question of its sufficiency upon the admission of the evidence, and thereby furnish an opportunity for amending the bill. The proof, which is now claimed to be improper under the allegations of the bill, was allowed to go in without objection. Such proof discloses a case for relief, which is not inconsistent with the object and scope of the bill, and therefore may be given proper effect in entering the decree. Although the relief granted may be different from the relief specifically prayed, yet if it is consistent with the allegations and proof made, it is properly granted. (*McNab* v. *Heald,* 41 Ill. 326; *Morrison* v. *Smith,* 130 id. 304; *Hopkins* v. *Snedaker, supra).* As, in the case at bar, the statement and charging part of the bill make a case for account, it is not proper to refuse to consider evidence, which discloses other facts in addition to those charged, when the facts disclosed strengthen the right claimed, and merely expand the measure of accounting.

*Fifth*—It is further claimed that the beneficiaries, whose rights are here in controversy, to-wit: the daughters of Mrs. Marr, and McKendree College, and the board of church extension, are estopped from complaining of the conduct of these defendants by reason of alleged acquiescence and *laches* on their part. So far as McKendree College and the board of extension are concerned, their interests were not to accrue under the will until the death of the last survivor of the life annuitants. They are, therefore, mere remainder-men, and, under the law, a remainder-man cannot acquiesce until his interest falls into possession. (Perry on Trusts,—3d ed.—sec. 467; *White* v. *Sherman*, 168 Ill. 589).

So far as Imogene and Harrietta Marr are concerned, we have been pointed to no evidence, and have discovered none, which shows that they had any notice or knowledge of the improper investment made of these funds by the administrator with the will annexed. There is nothing in the record to show that any of the beneficiaries acquiesced in the wrong here complained of, and therefore, the principles announced in *White* v. *Sherman, supra*, upon this subject are precisely applicable here.

*Sixth*—Where a cause of action arises from a fraud, the bar created by *laches* will not apply in equity until the discovery of the fraud, or until the fraud could have been discovered by the exercise of reasonable diligence; the failure to use diligence is excused where there is a relation of trust and confidence, which renders it the duty of the party committing the fraud to disclose the truth to the other. (*Farwell* v. *Great Western Tel. Co.* 161 Ill. 522). There is nothing here to establish the fact, that any of these beneficiaries were guilty of *laches* after their discovery of the improper conduct of the trustee. *Laches* cannot be here pleaded against any equitable right of the college or against the board of extension, because they are not asking that they be put into possession of the fund, but that it be secured. The lapse of time is

no bar or evidence of *laches* against them, because as remainder-men they had not come into possession at the time of the wrongful investment and continuance of the same. (*Bennett* v. *Colley*, 5 Sim. 181).

Our conclusion is that John Penn, trustee, the complainant in the cross-bill below, and one of the appellants here, and the beneficiaries in the trust which he represents, are entitled to the relief prayed for in the cross-bill.

Accordingly, the judgment of the Appellate Court and the decree of the circuit court are reversed, and the cause is remanded to the circuit court with instructions to proceed in accordance with the views herein expressed.

*Reversed and remanded.*