CAROLINE C. PIPER, Respondent, v. JOHN L. HOARD, Appellant.

Plaintiff's complaint alleged, in substance, that A. died seized of certain real estate which he devised to his two sons, J. and F., subject to the limitation as to F. that if he should die without issue his share should go to J. and his heirs; that F. conveyed his interest to defendant, who subsequently induced C., plaintiff's mother, to marry F. by means of the false and fraudulent representations that F. had a fine property so left to him that if he married and had an heir the land would go to the heir. The complaint further alleged that plaintiff was the only child of such marriage; that the real estate was partitioned between J. and defendant as the grantee of F., and defendant since then has occupied and still occupies and claims to own the part set off to him. The relief asked was that plaintiff be declared the owner of the portion so set off to defendant and be placed in possession thereof. On demurrer to the complaint *held*, that it set forth a good equitable cause of action and the demurrer was properly overruled; that defendant was bound by his representations and must be considered as holding the property as trustee *ex maleficio;* and so, should be held to make good the thing to plaintiff, who would have had the property had the representations been true; that it was immaterial that plaintiff was not living at the time the representations were made, as they were made in her favor and enure to her benefit; and that the question was not affected by the fact that plaintiff's mother was induced to agree to the marriage by purely mercenary considerations.

The law of marriage as administered by courts, so far as property interests are concerned is founded upon business principles, in which the utmost good faith is required from all parties, and the least fraud in regard thereto is the subject of judicial cognizance.

The distinction between the legal and equitable rules applicable to contracts and negotiations in reference to marriage, and those as to other matters pointed out.

(Argued April 22, 1887; decided October 11, 1887.)

APPEAL from judgment of the General Term of the Supreme Court in the fourth judicial department, entered upon an order. made January 13, 1885, which affirmed a judgment in favor of plaintiff entered upon an order overruling a demurrer to the complaint herein.

The substance of the complaint is set forth in the opinion.

*C. D. Adams* for appellant. Equity cannot interfere to relieve plaintiff from the consequences of her mother's design. (Perry on Trusts, § 173.) A constructive trust arises only in favor of the particular person upon whom the supposed fraud is practiced. The law interferes to imply a trust, only where it is absolutely necessary to do justice. (Hill on Trustees, 144 and notes; Story's Eq., § 184; Perry on Trusts, §§ 166, 168, 173; 75 N. Y. 244; 11 Hun, 406; 1 Abb. N. C. 136, *n.*) There was never a trust in plaintiff's favor. A trust to issue of marriage can only come through a marriage settlement. It cannot come through a tort, a fraud practiced upon the mother before marriage by a third person against him. (Perry on Trusts, § 874; Tyler on Coverture, 460, 461.) This case is not a fraud on marriage negotiations, within the jurisdiction of equity. (Perry on Trusts, § 208; Story Eq., § 268; Tiffany & Bullard, 121, etc.; Bacon's Abr. Marriage B.; 2 Beav. 1; 15 id. 341; 3 id. 469; 31 Eng. L. & Eq. 9; 6 J. Ch. 173; Pom. on Spec. Perf., § 328; 1 Abb. N. C. 136, *n.*)

*A. M. Beardsly* for respondent. Defendant perpetrated a fraud upon plaintiff's mother on the marriage of plaintiff's parents and upon plaintiff who claims thereunder and he is bound to make the thing good according to his representations. (*Montefiori* v. *Montefiori*, 1 Wm. Blacks. 364; *Berrisford* v. *Milward* 2 Atk. 49; *Hunsden* v. *Cheney*, 2 Vern. 150, Marg.; *Storrs* v. *Barker*, 6 Johns. Ch. 166, 173; *Neville* v. *Wilkinson*, Brown's Ch. C. 543–546; *Hammersley* v. *De Reil*, 12 Clark & F. 46; *Redmon* v. *Redmon*, 1 Vern. 347; *Harvey* v. *Ashley*, 3 Atk. 607, 610; Pom. on Spec. Perf. Cont., § 328 & *n*; *Lamlee* v. *Hauman*, 2 Vern. 499; 1 Story's Com. on Eq., §§ 271, 387, *n*; Atherly on Fam. Set.; 27 Law Lib., chaps. 34, 35, m. p. 484–500; *Scott* v. *Scott*, 1 Cox, 366; *Webber* v. *Farmer*, 4 Brown's Parl. C. 170.)

PECKHAM, J. This case comes here upon a demurrer to the plaintiff's complaint as not stating facts sufficient to constitute a cause of action. The Special Term overruled the demurrer

and granted defendant leave to answer upon payment of costs. This privilege the defendant refused to avail himself of and final judgment was duly entered against him. He appealed therefrom to the General Term, where the judgment was affirmed, with costs, and leave was again granted him to answer on payment of costs, and again the privilege was refused, when final judgment of affirmance being entered the defendant appealed to this court.

The complaint develops a curious state of facts. Its material averments are as follows: The plaintiff resides in the city of Utica and the defendant in Herkimer county. In 1842 one Andrew Piper died, a resident of that county, leaving a will which was duly proved, and by which he left all his property, including the farm in question, to his two sons, James and Frederick, and subject to the limitation in the case of Frederick, that if he should die without issue the portion of the estate devised to him should belong, and was thereby devised, to the brother James and his heirs. James and Frederick took possession of the farm (which consisted of 140 acres in Herkimer county), and continued to own it together until March 26, 1859, when Frederick conveyed his interest therein to defendant, who had, prior to 1859, married a niece of Frederick. In 1875 Frederick died. After defendant had procured a deed of his interest from Frederick in the farm above mentioned the defendant went to Utica to see one Catharine Hogel for the purpose of bringing about a marriage between her and Frederick, and thus procuring an heir to him, and defendant persuaded Catharine to go and see Frederick, defendant paying the expenses of the trip. In order to pursuade Catharine to marry Frederick, and in the course of his efforts in that direction, and referring to the interest of Frederick in the farm, the defendant falsely and fraudulently represented to her that Frederick had a fine property so left to him that if he married and had an heir the land would go to the heir. That, induced by such statements and representations made to her by the defendant, Catharine did marry Frederick on the 11th day of April, 1859, the result of which marriage was the birth of

the plaintiff within a year thereafter, and she is the only child of such marriage.

In September, 1859, the farm was duly partitioned between James Piper and the defendant, as the grantee of Frederick, by an interchange of deeds conveying the respective parts, and the defendant, since such conveyance, has occupied the part set off to him as the owner thereof, and still occupies and claims to own it. The relief prayed for was that plaintiff be declared the owner of the portion of the farm set off by partition to the defendant, and that plaintiff be placed in possession of the same. The judgments appealed from grant such relief, and defendant asks for their reversal while admitting the facts above stated. There was no opinion written by the learned judges at the Special or General Term, and we have not the benefit of their views upon this question.

The defendant, while confessing that he procured the fee of the farm (through this marriage) owned by the plaintiff's father, by means of his own fraudulent representations, yet claims that the plaintiff has no right of action against him on that account, because there is a lack of privity between him and plaintiff, and that plaintiff was not induced to any action by reason of his fraud and sustained no legal damage therefrom, and cannot, therefore, recover any from him, but must sit by and permit the land once owned by her father to be enjoyed by defendant, although procured by him by means of this fraud.

If to assume jurisdiction and grant relief in such a case would be to run counter to well-settled rules of equity, that fact would be a sufficient answer to the plaintiff's prayer for judgment herein. But if the most that can be said is that the case is novel and is not brought plainly within the limits of some adjudged case, we think such fact not enough to call for a reversal of this judgment. The spectacle of an individual enjoying property acquired by means of an admitted fraud is not one which appeals with any great force to the sympathies of a court in a civilized land in behalf of the perpetrator of the fraud. Such fraud is not in the least mitigated in its

character by the statement that it consisted of fraudulent representations made to a woman to induce her to consent to a marriage in which the mercenary motive was the strong if not the only one. The fact that she was ready and desirous of bettering her condition, even though it was by a mercenary marriage, does not alter the other fact that the defendant enjoys property which he has acquired by the successful perpetration of a fraud, and which, if the fraudulent representations by which he acquired it had been true, the plaintiff herein would be herself entitled to enjoy as owner.

Marriage has its sentimental and business sides. Courts have very little to do with the former. The whole law of marriage as administered by courts (so far as property interests are concerned) is founded upon business principles, in which the utmost good faith is required from all parties, and the least fraud in regard thereto is the subject of judicial cognizance. To say of plaintiff's mother, therefore, that she was too ready to marry a man because of the money he had or would necessarily leave to a child of the marriage, or that she was an adventuress, induced to marry solely by fraudulent representations as to the pecuniary condition of her husband, does not, as I have said, furnish the least reason for refusing relief to plaintiff if she be otherwise entitled to it. If her mother had not been induced to marry by any such pecuniary considerations, clearly no cause of action would exist. It is because such considerations were the moving ones, and were induced by the fraud of defendant, that the plaintiff bases her right of action. There are some anomalies in the law relative to contracts or negotiations having marriage for their consideration, and such contracts are based upon considerations which obtain in no other contract. The family relations and their regulation are so much a matter of public policy that the law in relation to them is based on principles not applicable in other cases; and all business negotiations having marriage for their end are regarded in much the same light by our courts. Thus a *particeps criminis* in the fraud has been permitted to recover in his own name against one who was no more guilty

than he, when the marriage had taken place by reason of such fraud.

In *Neville* v. *Wilkinson* (1 Brown Ch. 543), decided in 1782, the plaintiff was the individual who desired to marry his co-plaintiff's daughter, and he and the defendant, who was an attorney to whom he owed a large amount of money, agreed that defendant should represent to the father that the debt was much less than in truth it was. He did so, and after marriage he brought an action on a bond which would have made the debt in excess of the amount represented, and the plaintiff, the *particeps criminis,* was permitted to succeed in an action brought by him and his father-in-law to compel the surrender of the bond. The case is not cited as analogous to the one under discussion, but as proof of the statement that there are anomalies in this branch of the law. The reason has been already stated.

In *Roberts* v. *Roberts* (3 P. Wms. 66), decided in 1730, A. had treated for the marriage of his son, and, in the settlement on the son, a power was reserved to the father to jointure any wife whom he should marry in £200 per annum, in which case he was to pay the son £1,000. The father subsequently desired to marry a second time, and the son agreed with the second wife's relations to release the £1,000 and did release it but took a private bond back from the father for its payment. It was held that equity would not set aside the private bond, because it would be injurious to the son's wife whose marriage had taken place prior to the second one of the father, and being prior in point of time its equity must prevail. The master of the rolls said that the same arguments advanced to show that the bond should be discharged as an injustice to the second wife showed it should be paid or equal injustice would occur to the son's wife, and the maxim *qui prior est in tempore,* etc., should prevail. He also said that equity abhors all underhanded agreements in cases of marriage, "and, perhaps, this may be the only instance in equity where a person, though *particeps criminis,* shall yet be allowed to avoid his own acts." Many other cases of a similar nature might be cited.

Although these are instances of fraud arising in relation to marriage settlements, it is not perceived why courts may not go a step further in the same direction and permit a recovery on the part of a person situated like the plaintiff. The anomaly would be no greater in this case than in the others, and a man holding property through fraud would be compelled to give it up to the person who would be entitled to it if he had spoken the truth.

Under marriage settlements it is held the issue take their interests therein as purchasers under both parents, and hence may compel the payment into the fund by the promisors on the part of the wife, although those on the part of the husband had failed to pay in what they promised, because non-performance on one part shall be no impediment to the childrens receiving the full benefit of the settlement. (See *Harvey* v. *Ashley*, 3 Atk. 607, 611.) The action is sustained on the ground that the settlement was something in which the children were interested, and were privy to the party promising. Is there not sufficient privity in such a case as this between the defendant and the issue of the marriage induced by his fraud where the fraud consists of false and fraudulent representations made by him to the mother, which, if true, would entitle the issue to the ownership of the very property which he holds by virtue of such fraud? We think these facts create sufficient privity between the parties to sustain such an action as this. It is true the plaintiff was not born when the fraudulent representations were made. Still they were made by defendant to plaintiff's mother for the purpose of inducing a marriage between the parents, and if they had been true the plaintiff would have been the owner of this particular property. In this way she is the very person injured by the fraud, and although not individually in the mind of defendant when he perpetrated that fraud, yet, as filling the position of heir to her father, she belongs to the class which defendant had in contemplation when he represented to the mother that the heir of Frederick would have the farm. In this way it may be claimed that defendant had in view the plaintiff and the rights

he alleged she would have. Why should not the plaintiff be permitted to hold the defendant to his representations? The English courts have held that a person, who, by acts or speech, represents property as belonging to the proposed husband, when the possession thereof forms an inducement to the marriage, shall be bound to make good the thing in the manner represented. Such is the case of *Montefiori* v. *Montefiori* (1 Wm. Blackstone, 363, Easter Term, 1762, MANSFIELD, Ch. J.)

The facts of the case were these: Montifiori being engaged in a marriage treaty, his brother Moses to assist him in his designs and represent him as a man of fortune, gave him a note for a large amount of money as the balance of accounts between him and his brother Joseph, which balance he acknowledged to have in his hands, though in truth none existed. This note was shown by Joseph to the parents of the intended wife and was an inducement to the marriage. After the marriage Moses desired to reclaim the note so given without consideration and the matter was referred to arbitration, and the arbitrators awarded the note to be given up, which Joseph refused to do, and the case then came up on motion for an attachment against Joseph for non performance of the award, and Joseph made a cross motion to set aside the award. Chief Justice MANSFIELD held that where there were proposals of marriage and third persons represented anything in a light different from the truth, even though by collusion with the husband, they shall be bound to make good the thing in the manner in which they represented it. It shall be as represented to be, and the husband alone shall be entitled to relief as well as when the fortune has been specifically settled on the wife.

Atherly in his work on Marriage Settlements (27 Law Library, Chap. 34, marginal paging 484), after citing the above case says that the principle upon which the court proceeds in such cases, when the thing is not actually made the subject of the settlement, must be this, as he conceives, that as the wife must be presumed to agree to the marriage as well in expectation of the present support which she and her children will receive from her husband, as of the provision which he may

have made for them after his death, that a person who has been at all concerned in raising such expectation shall not be suffered in anywise to disappoint it.

Here in the case at bar it is necessary to take but one further step in order to maintain the action. It is only necessary to hold that the issue of the marriage which was brought about by the falsehood and fraud of the defendant shall be able to call him to account for such fraud and bind him to make good the thing in the manner in which he represented it, so that it shall be as he represented it to be. We see no reason why such step should not be taken. There is certainly none in the position of the defendant who stands before the court the possessor of property by reason of his fraud, which property, if it were as it was represented by defendant, would belong to the plaintiff herein. She can claim to be in privity with defendant, although he made the representations to her mother, because she is the child of the marriage brought about by the fraud of the defendant practiced upon the mother, and because she would be the owner of this property if the facts were as they were represented by the defendant to the mother.

It is true her own action was in no wise influenced by these representations for she was not then born. But where, in the peculiar and anomalous rules obtaining in that branch of the law regarding marriage, marriage settlements and frauds in relation thereto, a marriage is induced under circumstances, such as exist in this case, we think there is no trouble in holding the defendant bound by his representations, and that, in the character of a trustee *ex maleficio*, he shall be held to make good the thing to the person who would have the property, if the fact were as he represented it, assuming such person to be the fruit of the marriage brought about by those very representations.

The leading principle of this remedial justice is, by way of equitable construction, to convert the fraudulent holder of property into a trustee and to preserve the property itself as a fund for the purpose of recompense. (Perry on Trusts, § 170.)

There is no legal objection towards constituting such a trustee

in favor of one who was not *in esse* when the fraud was perpe-
trated, so long as it can be seen that such person seeks to take
the property which the defendant holds by virtue of his fraud,
and which such person would be entitled to hold if the repre-
sentations the defendant made in regard to it were true.
Equity will fasten upon a legatee or devisee the character of
a trustee, *ex maleficio*, where he procured the legacy or devise
by fraudulently promising the testator to apply it for the
benefit of others. (See cases cited *In Matter of Will of
O'Hara*, 95 N. Y. 403, 412, 413.) The principle would be
just as applicable if the fraudulent legatee had made the
promise by which the legacy was procured for the benefit of
some one thereafter to be born. The refusal to perform after
the party comes into existence would be just as much a fraud
as if refusal were in regard to one existing when the promise
was made.

In the case last cited, regarding the will of O'Hara (*supra*),
the legatees were converted into trustees *ex maleficio* in favor
of the heirs-at-law and next of kin of the testatrix, not one of
whom, perhaps, was living at the time the will was executed
and the promise made. There can be no objection, therefore,
to holding this defendant as such trustee, based upon the fact
that when he made the false representations the plaintiff was
not living. They were made in her favor and they can enure
to her benefit.

By a decision of this case in this manner we think at least
the cause of common honesty and decent morals is upheld,
while at the same time no rule of law or equity is violated.
The facts, as we have said, are quite novel in their character,
and the result is that a man who has procured property by
fraud is prevented by a court of justice from further enjoying
it, and compelled to surrender it to one who is the daughter of
the person from whom he procured it, and who would be entitled
to it if the representations which he made, and by which he
now enjoys it, were true. Such a result cannot be other than
satisfactory.

The defendant asks, if his demurrer be overruled in this

court, that he be permitted to withdraw it and answer on pay-ment of costs.     He has twice refused this favor in the Supreme Court.     We suppose that we have the power to grant it now under section 497 of the Code.     Formerly, in such a case as this, it was decided that this court did not have the power to grant such leave.     (*Whiting* v. *Mayor, etc., of N. Y.,* 37 N. Y. 600.)

Under the circumstances we do not think it would be well for us to grant the leave desired.     Changes may have taken place since the action was commenced which might have weight in deciding the merits of the application, such as the loss of testimony on the part of the plaintiff, or other changes of that nature.     Justice will be better attained by remitting that question to the Supreme Court where both sides may be heard upon an application and all the questions have appropriate consideration.

The judgment should, therefore, be affirmed, with costs, with leave to defendant to apply to the Supreme Court for leave to withdraw the demurrer and interpose an answer.

All concur, except RUGER, Ch. J., and ANDREWS, J., dissenting, and EARL, J., not sitting.

Judgment accordingly.