OPINION OF THE COURT
Aileen Haas Schwartz, J.
The familial entity established by the nonmarried parents in this proceeding reflects an increasing contemporary phenomenon, the so-called “nonmarital family”, that wreaks havoc with classic legal standards of parental responsibility towards a child born of such union.
Respondent father emphasizes the child’s status as illegitimate[1] and posits traditional norms consonant therewith to buttress a support obligation in the amount of $100 weekly. Petitioner mother advances the standard of living fashioned by the parents during an almost eight-year *511 period as the proper measurement and seeks equal allocation of expenses in the total amount of $1,000 weekly.
With the impending birth of their child, Barbara, on July 10, 1972, petitioner and respondent assumed characteristics of parents married to each other. Respondent father leased a two-bedroom apartment in his name on Central Park West. The child’s birth certificate identifies respondent as the father, and the child bears respondent’s surname. To avoid embarrassment to the child, the parties agreed that the mother would use the same surname on appropriate occasions. Petitioner mother and respondent father enrolled their child in a private school and attended the usual orientation programs as proud parents. Construction of a vacation home in Massachusetts was started in 1974, with special attention by the father to the design of the child’s room. A replica of the house was built as a playhouse for the child. Barbara was afforded lessons in dance and music and other social and cultural activities including theatre, parties and travel. As estimated by the mother, the standard of living set by the parents for the child approximates $600 to $1,000 weekly. As characterized by the father, “as an illegitimate child we would have to give her tender loving care.”
From the beginning of the intimate stage of their relationship, petitioner knew that respondent was married to another woman. Respondent, now 64 years of age, has been married since 1937. He has two adult daughters and one grandchild. His wife and he are partners in a public relations firm that specializes in the promotion of television productions. Their clients include some of the most prestigious corporations, and the productions publicized have been widely acclaimed. Petitioner and respondent met professionally, when petitioner, formerly a child actress and later engaged in freelance “film production jobs”, was employed by respondent. Now 38 years of age, petitioner married at the age of 21. That marriage was terminated by divorce some three years later. After the birth of the child herein, respondent employed petitioner and paid her a salary of approximately $250 weekly. Then, in 1973, after a successful joint endeavor to meet an emergency mailing deadline, petitioner and respondent decided to transfer some *512 mailing accounts from the independent mailing houses then utilized to a mailing house to be operated by petitioner. Respondent had encountered difficulties with the mailing houses he had engaged by virtue of the demanding time constraints endemic to media productions. Those problems were resolved when the petitioner’s business assumed responsibility for the mailings. As is customary, petitioner’s fees were billed to respondent’s clients through respondent. Financially, the undertaking proved highly rewarding. The profits provided income to support petitioner and the child. Supplementary generous contributions were made by respondent, but the large part of petitioner’s and the child’s expenses were paid by the mailing house’s profits.
The two “families” established by respondent bore striking resemblances: the two New York City apartments are on Central Park West; each has a vacation house in the woman’s name, of approximately the same value, about $75,000; one of respondent’s daughters born of his marriage was educated at a private school; respondent was associated professionally with each of the women; respondent, his wife and petitioner have assets of approximately $350,000 each; the same tax lawyer advises petitioner, respondent and the partnership in which respondent and his wife are partners; petitioner, and on occasion, the child, engages the services of a psychologist who provided therapy for respondent, his wife and one daughter.
Problems of a personal nature between petitioner and respondent culminated not only in their estrangement in the latter part of 1979 but in litigation involving the partnership and, hence, respondent’s wife. That litigation and the instant lawsuit have subsumed the concerns of the parties as parents. Petitioner devotes virtually all her time to the subject lawsuits. Contrasted with respondent’s testimony of love for Barbara, respondent has subordinated that love to legal advice by counsel. Accordingly, he has not seen Barbara for about eight months and he has paid support of $100 weekly.
In opposition to petitioner’s request for support pursuant to the pre-estrangement standard of living established by the parents for their child, respondent emphasizes the *513 mother’s “working class” family background and her like social and economic status at the beginning of their relationship as an essential legal measurement of an illegitimate child’s standard of living and hence of the respondent father’s support obligation. That argument conjures up the stereotypical portrait of the out-of-wedlock child born of a casual encounter between a “gentleman of means” or, indeed, of royal birth and a woman of far less impressive social status.
Focus upon the child’s illegitimacy, however, does invoke deeply rooted legal doctrines denying or severely limiting the support obligations of the father.
At common law, the out-of-wedlock child was films nullius, no one’s son.[2] Legal scholars are in agreement that “filius nullius expresses no mere technical' uncertainty as to the fatherhood of the bastard, but rather the moral antipathy, inculcated by the Church, to the irregular intercourse of which he was the fruit.”[3] Societal aversion to the out-of-wedlock child has been traced to Biblical sources[4] and to early Roman law.[5] Western culture reflects a profound moral commitment to the family as a legal institution solemnized by marriage. Blackstone instructs us that “ [t]he main end and design of marriage * * * [is] to ascertain and fix upon some certain person, to whom the care, the protection, the maintenance, and the education of the children should belong”.[6] Traditionally, marriage has been the fount of rights and obligations of the parents and those of the child. “[T]he illegitimate child was the loose thread in the social fabric.”[7]
English law was more liberal than continental systems— attributable, in no small measure, it is said, to the large number of the nobility whose ancestry was dubious. A more humane reasoning can be traced to Blackstone who argued: “And really any other distinction, but that of not inheriting, *514 which civil policy renders necessary, would with regard to the innocent offspring of his parents’ crimes, be odious, unjust, and cruel to the last degree”.[8]
Nevertheless, the legal disabilities of the out-of-wedlock child continued in England and the United States without significant change until the last half of this century. Early statutes reflected the practice of leaving out-of-wedlock children “to be kept at the charges of the parish where they be born” and the paramount concern for the “public’s purse”.[9] Ameliorative legislation permitting the mother to recover “limited maintenance” from the father of an out-of-wedlock child was enacted in England in 1844. (Poor Law Act of 1844.)[10] Comparable statutes were enacted in some States in the United States.* [11] Blackstone refers to the parental obligation of “maintenance,” stating that although illegitimate children “are not looked upon as children to any civil purposes, yet the ties of nature, of which maintenance is one, are not so easily dissolved.”[12] Contrasted with the out-of-wedlock child’s rights to legal redress, albeit dubious, was the stark reality of minimal maintenance provided by the public and the mother. By parliamentary acts in England and primarily by Supreme Court decision in this country, illegitimacy no longer constitutes an absolute bar to inheritance.
Today, the right of the out-of-wedlock child to support from her adjudged father must be viewed within the framework of related jurisprudential themes:[13] the law’s early recognition of a distinction between the out-of-wedlock child’s agnate and cognate status with resultant maternal rights of guardianship and custody; the expanding legal cognizance of the paternal interest in guardianship and *515 custody (see Caban v Mohammed, 441 US 380; Stanley v Illinois, 405 US 645); the rejection of gender as a constitutionally permissible per se classification of spousal rights and obligations (see Orr v Orr, 440 US 268); the developing constitutional right of sanctity of the family against governmental intrusion (see Moore v East Cleveland, 431 US 494, 498-499; Wisconsin v Yoder, 406 US 205, 231-233); the due process rights of the child (see Matter of Gault, 387 US 1).
Manifestly, the declaration by the United States Supreme Court of the out-of-wedlock child’s equal protection rights constitutes the most significant juridical development for such child.
Caricatured as “constitutional curiosities” by Justice Harlan dissenting in Levy v Louisiana (391 US 68, 76), the development of the equal protection rights of the out-of-wedlock child has been uneven. The opinion of the court by Justice Douglas and the dissenting opinion of Justice Harlan joined by Justices Black and Stewart portray the dominant polar views. As perceived by the dissenters (supra, p 76): “The question in these cases is whether the way in which Louisiana has defined the classes of persons who may recover is constitutionally permissible. The Court has reached a negative answer to this question by a process that can only be described as brute force.” In its opinion, the court “start [ed] from the premise that illegitimate children are not ‘nonpersons’ * * * They are clearly ‘persons’ within the meaning of the Equal Protection Clause of the Fourteenth Amendment.” (Supra, p 70.) Of portentous moment, the court identified the interest implicated as an intimate, familial relationship and included illegitimacy within those classifications involving “basic civil rights” and hence entitled to stricter judicial scrutiny in testing legislative majoritarian processes.[14] Although the court has considered legislative classifications based upon illegitimacy in a host of cases since Levy v Louisiana (supra), the standard to test such classification has not been definitively formulated. *516 Yet, it is not mere hyperbole to state that the standard determines the case.
Some patterns can be discerned: While Legislatures have wide discretion in establishing statutory classifications, the equal protection clause requires, at a minimum, that the classification bear a rational relationship to a legitimate State purpose. Generally, State laws are entitled to a presumption of validity against challenge under the equal protection clause. In applying the equal protection clause to social and economic legislation, great latitude is afforded the Legislature. (Levy v Louisiana, 391 US 68, 71, supra.) When State statutory classifications implicate sensitive and fundamental personal rights, the court exercises a stricter scrutiny. “The essential inquiry in all the foregoing cases is, however, inevitably a dual one: What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger?” (Weber v Aetna Cas. & Sur. Co., 406 US 164, 173.)
Racial distinctions, in a constitutional sense, are inherently “suspect”. Such classifications call for the strictest judicial scrutiny. The presumption of validity does not apply.
“And the presumption of statutory validity may also be undermined when a State has enacted legislation creating classes based upon certain other immutable human attributes. See, e.g., Oyama v. California, 332 U.S. 633 (national origin; Graham v. Richardson, 403 U.S. 365 (alienage); Gomez v. Perez, 409 U.S. 535 (illegitimacy); Reed v. Reed, 404 U.S. 71 (gender).” (Parham v Hughes, 441 US 347, 351.) To withstand scrutiny under the equal protection clause, gender-based classifications must “serve important governmental objectives and must be substantially related to achievement of those objectives.” (Craig v Boren, 429 US 190, 197; see Orr v Orr, 440 US 268, supra; Stanton v Stanton, 421 US 7, 14; Reed v Reed, 404 US 71.) Classifications based on illegitimacy “are invalid under the Fourteenth Amendment if they are not substantially related to permissible state interests.” (Lalli v Lalli, 439 US 259, 265.)
On several occasions subsequent to Levy v Louisiana (391 US 68, supra), State legislative classifications that dif *517 ferentiate between out-of-wedlock children and legitimate children have been deemed violative of the equal protection clause. (See, e.g., Trimble v Gordon, 430 US 762; Gomez v Perez, 409 US 535; Weber v Aetna Cas. & Sur. Co., 406 US 164, supra.) The moral postulate for the special protection afforded the out-of-wedlock child was best stated by Justice Powell speaking for the court in Weber v Aetna Cas. & Sur. Co. (supra, pp 175-176):
“The status of illegitimacy has expressed through the ages society’s condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual — as well as an unjust — way of deterring the parent. Courts are powerless to prevent the social opprobrium suffered by these hapless children, but the Equal Protection Clause does enable us to strike down discriminatory laws relating to status of birth where — as in this case — the classification is justified by no legitimate state interest, compelling or otherwise.”
Judicial sensitivity to the plight of the out-of-wedlock child has not been extended to a classification that disfavored fathers of deceased out-of-wedlock children, who could have but did not legitimate the child. (Parham v Hughes, 441 US 347, supra.) The court in Parham v Hughes (supra) applied the rational relationship test and sustained the legislation.
Of directly controlling impact upon the matter sub judice, the Supreme Court has held “that once a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother.” (Gomez v Perez, 409 US 535, 538, supra.)
New York law prescribes parental support of the out-of- *518 wedlock child by statutory provision separate and different from those for the child born of a marriage.[15]
*519 Whatever the validity of constitutional challenge to the New York statutory scheme under other circumstances, in the instant matter, the statutory differences are a matter of semantics not substance in light of United States Supreme Court decisions and their jurisprudential progeny, as indicated above, (1) rejecting broad gender-based distinctions regarding spousal and parental rights and obligations and (2) recognizing the, equal protection rights of the out-of-wedlock child and correlative parental obligations, and in light of parallel developments' in New York State public policy regarding the rights of the out-of-wedlock child and correlative parental obligations.
Liability of the father of an out-of-wedlock child in New York exists solely by virtue of statute. Early law in this regard was included in the Code of Criminal Procedure. Consonant therewith, decisional precedents established that “[t]he proceedings by which the liability shall be determined and fixed are defined and controlled exclusively by the statutes which must be in their substance strictly and fully complied with. (Hutton v. Bretsch, 216 N.Y. 23).” (People ex rel. Lawton v Snell, 216 NY 527, 532.)
Indemnification of the public purse constituted the paramount societal interest, and support orders sufficient to afford only “bare necessities” accomplished that purpose and were deemed legal satisfaction of the parental obligation. Legal cognizance of a standard commensurate with the moral obligation of the parent to the out-of-wedlock child represents a recent development. New York State public policy regarding the parental support obligation was described by the Court of Appeals in 1961 (Haag v Barnes, 9 NY2d 554, 560) : “It is settled that the New York Paternity Law requires something more than the provision of ‘the bare necessities otherwise required to be supplied by the community’, that, ‘although providing for indemnification of the community, [it] is chiefly concerned with the welfare of the child’.” Haag v Barnes (supra) contains a limited reference to Schaschlo v Taishoff (2 NY2d 408). Schaschlo v Taishoff (supra) is of far greater significance in its perception of New York State concern for the out-of-wedlock child. Granted, the primary role of the New *520 York State Legislature in setting public policy regarding the out-of-wedlock child, Schaschlo v Taishoff (supra) serves as the juridical counterpart in defining the correlative judicial role. Although there have been some statutory changes since Schaschlo v Taishoff (supra), New York State policy affording primacy to the welfare of the child has remained constant. Indeed, that policy has been strengthened by the above-discussed constitutional rights of the out-of-wedlock child. Schaschlo v Taishoff (supra, p 411) instructs: New York State is “chiefly concerned with the welfare of the child”, and statutes providing for support “should be liberally construed * * * keeping in mind at all times the statute’s primary purpose.”
Notwithstanding the recent developments respecting the rights of the out-of-wedlock child, a most vexing element in formulating an order of support for the out-of-wedlock child remains. That factor has been identified and emphasized by respondent father. As the distinguishing characteristic of the child’s status is the absence of a legal relationship between the mother and father, how can an order of support for the child exceed the mother’s standard of living without raising her standard and hence constituting imposition of an “unauthorized” obligation on the part of the father toward the mother? Manifestly, the problem is endemic to the circumstance of illegitimacy, but presentation of like situations regarding the child born of a marriage in light of recent “gender-neutral” and related legislation makes the difficulty far less unusual today.
Guidelines were early enunciated. Of critical significance is the reasoning in Schaschlo v Taishoff (2 NY2d 408, 411-412) : “We find nothing to indicate * * * that the ‘station in life of its mother’ was intended to serve as a fixed and invariable maximum, rendering immaterial the father’s means except insofar as they suffice to meet this maximum. If such were the case it would mean that an illegitimate child born to an impoverished woman or one of obviously low station would have to suffer the added misfortune of a meager support award, sufficient only to provide for his needs at that humble level, regardless of the father’s ability to afford a comfortable or advantageous existence * * * *521 Nor is the father’s financial ability the sole criterion.” Difficulty in fashioning proper relief does not excuse judicial responsibility to vindicate legal interests.
Whatever the situation in other cases, application of the constitutional, statutory and decisional rights of the child in this proceeding requires parental obligation consonant with the standard of living established by the mother and father for their child. Contrasted with the father’s procrustean-Iike legal contentions, he admitted, in writing and testimony, responsibility for contribution to the child’s support, and specificially for private school tuition, measured by his financial ability. In his testimony, the father spoke of the same love and concern for the child as that for each of his other children. The mother, too, accepts equal allocation of financial obligation consistent with her assets and earning capacity, past and potential. Eliminating the claimed expenses in connection with the mother’s house in Massachusetts, the child’s expenses, reflective of the standard established by the father and mother, are fixed at approximately $515 weekly. Additional expenditures by the mother were viewed as excessive by the father and are disallowed. Both the father and mother are clearly able to meet one half of the amount fixed, and such allocation is found to be appropriate. Under all the circumstances, especially the clearly evident bitterness of the parties’ estrangement, it is necessary to identify separate areas of financial responsibility. Accordingly, the father is to meet his obligation in the following manner: (1) payment of $100 weekly, (2) payment of all private school expenses commencing with the September, 1980 school term, and (3) payment of summer camp expenses or a substitute summer activity, either of which is to be approved by the father, in an amount not exceeding $2,000, commencing the summer of 1981.

. The word “illegitimate” is used in United States Supreme Court opinions; New York statutory law adopts the term “out of wedlock”. (See General Construction Law, § 59.)

. 1 Blackstone’s Comm, p 458.

. Hooper, The Law of Illegitimacy, p 27, cited in Krause, Illegitimacy: Law and Social Policy, p 2.

. Deuteronomy 23:2.

. 1 Blackstone’s Comm, pp 455-457.

. 1 Blackstone’s Comm, p 455.

. Krause, Illegitimacy: Law and Social Policy, p 1.

. 1 Blackstone’s Comm, p 458.

. Stone, Family Law, An account of the Law of Domestic Relations in England and Wales in the last quarter of the twentieth century, with some comparisons, p 223.

. Stone, Family Law, An account of the Law of Domestic Relations in England and Wales in the last quarter of the twentieth century, with some comparisons, p 223.

. Krause, Illegitimacy: Law and Social Policy, pp 297-306.

. 1 Blackstone’s Comm, p 458.

. See Developments in the Law — The Constitution and the Family (93 Harv L Rev 1156).

. For differing views regarding the role of the court vis-a-vis legislative majoritarian action, see Dworkin, Taking Rights Seriously, and Ely, Democracy and Distrust: A Theory of Judicial Review.

. Family Ct Act, § 513: “Obligation of parents. Each parent of a child born out of wedlock is liable for the necessary support and education of the child and for the child’s funeral expenses.”
Family Ct Act, § 545: “Order of support by father. In a proceeding in which the court has made an order of filiation, the court shall direct a father possessed of sufficient means or able to earn such means to pay weekly or at other fixed periods a fair and reasonable sum for the support and education of the child until the child is twenty-one.”
But cf. as to child born in wedlock:
Family Ct Act, § 413: “Parents’ duty to support child. The parents of a child under the age of twenty-one years are chargeable with the support of such child and, if possessed of sufficient means or able to earn such means, may be required to pay for such child’s support a fair and reasonable sum according to their respective means, as the court may determine and apportion.” (As amd L 1980, ch 281, §28.)
Family Ct Act, § 443: “Order of support by parent; duration. If the court finds after a hearing that a parent is chargeable under section four hundred thirteen with the support of his or her child and is possessed of sufficient means or able to earn such means, the court shall make an order requiring the parent to pay weekly or at other fixed periods a fair and reasonable sum for or towards the support of such child.”
Domestic Relations Law, § 236, part B, subd 7: “Child support, a. In any matrimonial action, or in an independent action for child support, the court as provided in section two hundred forty of this chapter may order either or both parents to pay temporary child support or child support. The court shall not consider the misconduct of either party but shall make its award for child support after consideration of all relevant factors, including:
“(1) the financial resources of the custodial and noncustodial parent, and those of the child;
“(2) the physical and emotional health of the child, and his or her educational or vocational needs and aptitudes;
“(3) where practical and relevant, the standard of living the child would have enjoyed had the marriage not been dissolved;
“(4) where practical and relevant, the tax consequences to the parties; and
“(5) the non-monetary contributions that the parents will make toward the care and well-being of the child.”
Domestic Relations Law, § 240: “Custody and maintenance of children.
“1. In any action or proceeding brought (1) to annul a marriage or to declare the nullity of a void marriage, or (2) for a separation, or (3) for a divorce, or (4) to obtain, by a writ of habeas corpus or by petition and order to show cause, the custody of or right to visitation with any child of a marriage, the court must give such direction, between the parties, for the custody, care, education and maintenance of any child of the parties, as, in the court’s discretion, justice requires, having regard to the circumstances of the case and of the respective parties and to the best interests of the child.”
See in this regard section 516 of the Family Court Act providing for a binding agreement of support of an out-of-wedlock child and Bacon v Bacon (46 NY2d 477), which sustained the section against “equal protection" challenge.