284 S.E.2d 912 (1981)
STATE of W. Va. ex rel. S. M. B.
v.
D. A. P.
No. 14978.
Supreme Court of Appeals of West Virginia.
December 11, 1981.
*913 James T. Kratovil, Asst. Pros. Atty., Weston, for appellant.
Douglas A. Cornelius, Clarksburg, for appellee.
NEELY, Justice:
W.Va.Code, 48-8-1 [1961] makes it a criminal offense for any parent, without lawful excuse, to desert or willfully neglect or refuse to provide for the support of his or her legitimate or illegitimate child. W.Va.Code, 48-7-1 [1969] permits any unmarried woman to accuse any person of being the father of an illegitimate child within three years of the child's birth to establish paternity as a foundation for a continuing obligation of support. The question before the Court today is whether the three year statute of limitations which circumscribes an illegitimate child's right to establish his putative father's obligation of support is unconstitutional under the Fourteenth Amendment to the Constitution of the United States and art. III, §§ 10 and 17 of the Constitution of the State of West Virginia. We find that it is.
The appellant, S. B., gave birth to a male child 29 August 1976 at which time the birth certificate indicated that there was "no father." On 20 December 1978 a bastardy warrant was allegedly issued by a Lewis County Magistrate but was misplaced. On 11 October 1979 a new bastardy warrant entitled "duplicate" was issued by the same magistrate and still bore the original date of 20 December 1978.
On 2 April 1980 the Circuit Court of Lewis County heard arguments on the appellee's motion to dismiss the warrant because the action was barred by the bastardy statute's three year limitation. After argument the circuit court dismissed the warrant because the action had not been brought within three years of the child's birth. In addition to the appellant's constitutional challenge to the three year statute of limitations, appellant maintains that the original warrant was issued in due time and that the saving provision of W.Va.Code, *914 55-2-18 [1923] applies. Since we find the statute of limitations unconstitutional we need not address the issue of whether the action was commenced within due time.
Appellant asserts that the obligation of a parent to support a legitimate child continues during the child's entire minority; an action to enforce that obligation may be brought at any time from birth until the child becomes eighteen-years-old. Furthermore, W.Va.Code, 48-8-1 [1961] imposes an obligation on parents to support both their legitimate and illegitimate children.[1] Yet Code, 48-7-1 [1969] completely bars an illegitimate child from enforcing the obligation of support unless the question of paternity is established within three years of his birth.[2] Appellant argues that the unequal treatment of legitimate and illegitimate children based exclusively upon the accident of whether they were born in wedlock creates classes based upon certain immutable human characteristics which bear no substantial relationship to a permissible state interest. Lalli v. Lalli, 439 U.S. 259 (1978) at 265, 99 S.Ct. 518, at 523, 58 L.Ed.2d 503. We agree.

I
The Supreme Court of the United States has not squarely addressed the issue of statutes of limitations in this context; however, in numerous cases during the last ten years the Court has nibbled away at State-imposed impediments to the exercise of rights by illegitimate children vis-a-vis legitimate children. While the Supreme Court has not declared illegitimacy to be a suspect classification for equal protection purposes, see Mathews v. Lucas, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), it has struck down statutes limiting the rights of illegitimate children to inherit from their natural parents. See Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977); but see Lalli v. Lalli, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978). The Court also declared legislation unconstitutional which denied illegitimate children the right to recover in a wrongful death action for the death of a parent. Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968). Similarly the Court struck down laws limiting the rights of illegitimate children to sue for child support, Gomez v. Perez, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973), and it overturned a workmen's compensation scheme which excluded illegitimate children from recovery, Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). In all of these instances the Court used equal protection analysis.
The State courts are divided on whether statutes of limitation such as the one before us are constitutional. We conclude, however, that the direction of modern authority, based upon the persuasive analysis in the cases finding the statutes of limitation unconstitutional, is to find such statutes unduly restrictive. Ultimately, we believe, the Supreme Court of the United States will mandate such a result. See J.L.P. v. C.L.B., 107 Daily Wash.L.Rep. 401 (Super. Ct.D.C.1979); Florida v. West, 378 So.2d 1220 (Fla.1979); Stringer v. Dudoich, 92 N.M. 98, 583 P.2d 462 (1978).
In the case of County of Lenoir ex rel. Codgell v. Johnson, 46 N.C.App. 182, 264 S.E.2d 816 (1980) the Court made a cogent public policy argument to rebut the proposition that a statute of limitations was necessary to prevent the litigation of stale claims. The Court said:

*915 The need for a statute of limitations in civil paternity actions must especially be questioned in light of advances which have recently been made in blood typing, such as the HLA typing test, which in combination with other tests had been determined to be between 95.4 and 99.4 percent accurate in determining a defendant's lack of paternity. See, Kateley, Codere and Maldonado, Blood Testing in Disputed Parentage: The Current Role of HLA Typing, 1 Clinical Immunology Newsletter (No. 4, Feb. 1980); Joint AMAABA Guidelines: Recent Status of Serologic Testing in Problems of Disputed Parentage, 10 Fam.L.Q. 247 (1976). In light of these considerations, it must be concluded that G.S. 49-14(c)(1) [the North Carolina statute under consideration] can scarcely be termed a narrow approach to the fraud problem, carefully tuned to alternative considerations, as mandated by the Supreme Court in Mathews. The truth of the matter is that the statute presents a broad impenetrable barrier to many illegitimate children who seek support from their natural fathers after their third birthday. It makes no difference that this statute only bars illegitimate children from proving paternity, and does not directly prohibit their obtaining support. Under our laws, to prevent a child from asserting paternity is to prevent it from receiving support from its natural father.

II
The appellee argues, in accord with substantial authority among the states, that there is a permissible state interest in limiting paternity actions to the statutory three year period to avoid fraudulent claims brought when a defendant is unable to prepare his defense adequately. E.g., Cessna v. Montgomery, 63 Ill.2d 71, 344 N.E.2d 447 (1976); State ex rel. Krupke v. Witkowski, 256 N.W.2d 216 (Iowa 1977). We decline to accept this argument because the procedure for establishing paternity is quasi-criminal in nature. While a paternity action does not involve potentially either a fine or imprisonment, nonetheless, the action is begun by warrant in Magistrate Court and has many of the attributes of a criminal prosecution. See State ex rel. Graves v. Daugherty, W.Va., 266 S.E.2d 142 (1980). Preeminent among these attributes is the requirement that paternity be proven beyond a reasonable doubt.
Furthermore, due process requires that an indigent defendant charged with paternity be provided court-appointed counsel. Graves, supra. Indigent paternity defendants, who move the Court to order blood grouping tests, are entitled to have the expense borne by the State. Id. In light of the fact that scientific technology for excluding putative parents has improved dramatically in the last ten years, see County of Lenoir ex rel. Codgell v. Johnson, supra, combined with the plaintiff's need to prove paternity beyond a reasonable doubt, we conclude that the passage of time works ineluctably in favor of the defendant and not in favor of the plaintiff. In this regard a paternity action is significantly different from an ordinary tort action where the claim may be established by a mere preponderance of the evidence.
Finally, there is an argument to be made for striking this statute founded in the evolving concept of structural due process which recognizes that statutes which are entirely rational at the time they are enacted by the legislature may, by the passage of decades, become irrational when applied to an entirely changed social structure. See Beller v. Middendorf, 632 F.2d 788 (9th Cir. 1980); Geraghty v. United States Parole Commission, 579 F.2d 238 (3rd Cir. 1978); Tracy v. Salamack, 572 F.2d 393 (2nd Cir. 1978).
In this regard we would note that the incidence of illegitimacy rises in this country every year; furthermore, a few women, perhaps following the example of T. S. Garp's mother, J. Irving, The World According to Garp (1978) deliberately choose to have children out of wedlock because they consciously decide that they want a child but not a husband. See, e.g., Rivlin, "Choosing to Have a Baby on Your Own," *916 Ms, April 1979, p. 68. While we hardly find this either an intelligent or an appropriate approach to the sound upbringing of children, nonetheless, we must recognize the existence of new patterns of life.[3] The difficulty, of course, with eccentric lifestyles is that when they fail to yield the results which were intended the ultimate burden of compensating for individuals' lack of foresight ultimately falls upon the inadequate resources of the West Virginia Department of Welfare.
Frequently in this age men and women will enjoy a protracted family-like relationship over a course of many years without any solemnization through marriage. When people are living together and a father voluntarily supports his illegitimate child or children there is little thought of commencing an adversarial procedure to establish paternity. In fact, a woman who either aspires to an eventual legal marriage or merely to a continued stable relationship would be quite foolish to bring ill will upon herself by initiating a paternity action.
What happens, however, under our existing statute, when five or six years after the birth of a child the father decides to abandon his dependents? Certainly the illegitimate child is placed at an enormous disadvantage notwithstanding that he is entirely innocent of any wrongdoing. He is deprived of all the rights to which he would have been entitled but for the irresponsible conduct of his parents. In effect, if women were aware of the pitfalls which this statute creates, that awareness would actually achieve an entirely irrational result. If cognizant of these pitfalls, a woman initiated legal action against her mate, that adversarial proceeding in and of itself would obstruct collateral attempts to regularize an initially illicit relationship through marriage a result which ultimately must inure to the detriment of the child.[4]
Accordingly, for the reasons set forth above, we find so much of W.Va.Code, 48-7-1 [1969] as creates a three year statute of limitations unconstitutional and we strike only that portion. Under the doctrine of the least intrusive remedy, State ex rel. Whitman v. Fox, W.Va., 236 S.E.2d 565 (1977), we do not strike the entire statute.
Reversed and remanded.
NOTES
[1] W.Va.Code, 48-8-1 [1961] reads in pertinent part as follows: "[A]ny parent who shall, without lawful excuse, desert or wilfully neglect or refuse to provide for the support and maintenance of his or her legitimate or illegitimate child or children, under the age of eighteen years, in destitute and necessitous circumstances, shall be guilty of a misdemeanor, ... and the court may order such payments to be made to the wife, guardian, custodian or trustee of such minor child or children as he may deem necessary for their maintenance...."
[2] W.Va.Code, 48-7-1 [1969] reads in pertinent part as follows: "Any unmarried woman may go before a justice of the county in which she resides and accuse any person of being the father of a bastard child of which she has been delivered. Such justice shall examine her under oath, and reduce her examination to writing and sign it. On such examination, unless the child be three-years-old or upwards, the justice shall issue a warrant,...."
[3] One such pattern was described in Carolyn C. v. Frank G., 106 Misc.2d 510, 434 N.Y.S.2d 98 (Fam.Ct.1980) in which the unwed mother of an eight-year-old child sought child support from the natural father. It seems that for the years preceding the suit, the father provided the mother and child with an apartment on Central Park West and enrolled the child in a private school, paid for dancing lessons and built a summer house for this "family." The mother used the father's surname when appropriate so as not to embarass the child, who had the father's surname. The father even attended the orientation programs for parents of students at the private school. While all this was going on, the father lived with his wife in another apartment in Central Park West and maintained another vacation residence for his wife's use. When the illicit relationship eventually soured, the father thought that he could reduce his support to a level commensurate with the mother's previous low station in life. In a decision which we applaud, the court held that the father had to contribute half the sum which was likewise contributed by the mother, to maintain the child's established standard of living.
[4] We are also mindful of the lasting and recurring effects which unknown parentage has on a child throughout his life. Whether entering the military, applying for most government jobs, or seeking a passport, a child denied the proof of parentage under this statute will have to answer sworn questionnaires by saying that his father is "unknown."