OPINION OF THE COURT
Aileen Haas Schwartz, J.
Ghosts of unmourned legal doctrine are now evoked to stigmatize an out-of-wedlock child for the sins of the mother. Pleaded in classic form, the defense identifies those sins as fraud and deceit in connection with the conception of the child. To further accentuate the gravity of the wrong alleged, the respondent argues that the deception constituted a violation of his constitutional right of procreational choice. So compounded by a constitutional dimension, the mother’s misconduct, respondent urges, not only relieves him of all financial responsibility for the support of the child but also bars an adjudication of paternity.
The remedy sought is extraordinary — the paternity proceeding analogue of a prayer for rescission in equity.
*283 The nature of respondent’s defense necessitated an expansive range of relevance of the background circumstances of the parties’ relationship and the subject conception. Petitioner, an executive in the cosmetics industry, and respondent, a media executive, renewed their college friendship in the autumn of 1979. Both were then approaching their late thirties. At first their meetings consisted solely of reminiscences and exchanges of career and professional accomplishments in the intervening years. At the very end of December, 1979, while on a long trip tó their hometown, their relationship became intimate. That first night, according to respondent, he relied on petitioner’s representation that she “took birth control pills” and refrained from purchasing further contraceptive protection. Respondent testified that he also relied upon petitioner’s statements during their earlier conversations that she had had two abortions, that she was not ready for children, and that she was totally committed to her career. For his part, respondent was married and the father of four children. He remains separated from his wife, and he has been cohabiting with another woman for some years. Petitioner recalled that she had been led to believe that respondent was divorced, and it was not until some time later that she discovered the respondent’s cohabitation with another woman. After a few months, at the end of March, 1980, petitioner terminated their relationship because of the “other woman.”
The petitioner admitted earlier pregnancies, the birth of one child whom petitioner “surrendered” for adoption at birth, one abortion and one miscarriage, and she further admitted that motherhood was incongruent with her professional plans. She testified that she had discontinued the use of “birth control pills” some years earlier upon medical advice, and she denied advising respondent of her use of such contraception. Indeed, she further testified she was unable to use an intrauterine device because of a fibroid condition and relied upon “foam” or similar contraception. Petitioner denied sexual relations with anyone other than respondent during the period of their relationship. Respondent conceded there was no further representation subsequent to the “first night” statement. Notwithstanding re *284 spondent’s persuasive efforts, physical and verbal, petitioner steadfastly refused to have the pregnancy aborted.
The date of conception, March 19, 1980, was established by petitioner’s testimony and that of her treating gynecologist. The doctor also testified that the birth on November 28, 1980, some days earlier than the projected due date of December 12, 1980, resulted from medical concern for petitioner’s condition, which included hypertension and a “fibroid uterus,” and that of the infant.
The results of the human leucocyte antigen blood tissue test were admitted in evidence pursuant to section 532 of the Family Court Act.[1] The medical expert, a prominent immunohematologist, who had prepared the report testified that the results showed a plausibility of paternity of .998. The degree of certitude of paternity was heightened by the relatively unusual blood types of petitioner and respondent. According to Hummels Predicates,[2] the witness explained, the calculation of .998 indicates that paternity is “practically proved.”
There were no troublesome aspects in the proof of paternity. Respondent’s paternity was established clearly and convincingly.
The vexing issue in this case is whether the defense of fraud and deceit should be afforded judicial cognizance in a paternity proceeding.
Respondent relies upon Matter of Pamela P. v Frank S. (110 Misc 2d 978), which afforded legal effect to the defense of fraud and deceit, albeit in a limited manner. An appeal in that case is now sub judice at the Appellate Division. Under that circumstance and further because the evidence in the case at bar failed to establish the defense, suffice it *285 to state some grave concerns that militate against affording legal cognizance to a defense of fraud and deceit in a paternity proceeding:
(1) Respondent’s defense directly challenges recent Supreme Court jurisprudence vindicating the equal protection rights of the out-of-wedlock child.[3] The unequivocal thrust of such rights is the legal insulation of the child visá-vis both parents from the circumstances of conception. Manifestly, the instant defense would create a new and inferior category of out-of-wedlock child based upon the circumstances of conception and would subordinate the constitutional rights and other interests of the child to those of one of the parents.
The primary attribute of the out-of-wedlock child’s constitutional rights is the legal status of the child-parent relationship with concomitant parental obligation notwithstanding the nonmarital and hence nonlegal relationship of the parents. Such status constitutes an unequivocal repudiation of common-law doctrine that branded the child as filius nullius, no one’s son. (1 Blackstone’s Comm [Cooley ed], p 458.)
The Supreme Court’s special concern for the out-of-wedlock child would appear instructive in this regard: “The status of illegitimacy has expressed through the ages society’s condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust.” (Weber v Aetna Cas. & Sur. Co., 406 US 164, 175.) Yet, judicial sensitivity to the plight of the out-of-wedlock child has not been extended to a classification that disfavored fathers of deceased out-of-wedlock children, who could have but did not legitimate the child. (Parham v Hughes, 441 US 347; see Matter of Carolyn C. v Frank G., 106 Misc 2d 510, regarding the constitutional, decisional and statutory rights of the out-of-wedlock child.)
(2) The latitude of respondent’s interpretation of the so-called constitutional right of procreational choice appears to exceed that envisaged by the Supreme Court. *286 Particularly informative in this regard is the reasoning in Eisenstadt v Baird (405 US 438, 453): “If under Griswold the distribution of contraceptives to married persons cannot be prohibited, a ban on distribution to unmarried persons would be equally impermissible. It is true that in Griswold the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.”
(3) The gravamen of respondent’s defense so profoundly affects the very status, nature and quality of the parent-child relationship as to require classification with those actions deemed, at best, better reserved for legislative, rather than judicial, attention. (See Becker v Schwartz, 46 NY2d 401.) The Court of Appeals in Becker v Schwartz, addressed the emerging concept of “wrongful life” and provided insight into the thinking processes of the judicial mind grappling with an issue that, in the words of the court, “casts an almost Orwellian shadow”. (46 NY2d, at p 408.) Becker v Schwartz presents a comprehensive analysis of “wrongful life” as a legal concept. In Becker v Schwartz (supra), the Court of Appeals dismissed an action for “wrongful life” instituted on behalf of an infant who was born afflicted with Down’s Syndrome, commonly known as mongolism, upon the ground that the cause was not legally cognizable. Of particular significance to the respondent’s defense is the Court of Appeals’ reliance upon the law in actions for “wrongful birth” instituted by children born out-of-wedlock against, in most instances, the father. As the Court of Appeals reasoned (pp 409-410): “While courts have struggled with the concepts of ‘wrongful conception’ or ‘wrongful diagnosis’ as cognizable causes of action, they have had little difficulty in rejecting a cause of action which may be distinguished by use of the term ‘wrongful birth’. In the latter cause of action an illegitimate, but otherwise healthy child, seeks recovery in his or her own *287 behalf for the injury suffered as a consequence of his or her birth into this world as a stigmatized child. To this point, courts have refused to sustain this cause of action. (See Williams v State of New York, 18 NY2d 481 [action against State which had custody of mother]; Stills v Gratton, 55 Cal App 3d 698 [action against physician for alleged negligent performance of an abortion]; Zepeda v Zepeda, 41 Ill App 2d 240, cert den 379 US 945 [action against father]; Slawek v Stroh, 62 Wis 2d 295 [action against father].)” (In Becker v Schwartz, the court sustained a cause of action in medical malpractice instituted by the child’s parents for recovery of expenses for the long-term institutional care of their child; see, also, Albala v City of New York, 54 NY2d 269.)
In Stephen K. v Roni L. (105 Cal App 3d 640, 642), in reasoning singularly apposite to the defense at bar, the California appellate court affirmed dismissal of a father’s cross complaint against the mother in a paternity proceeding, holding: “As between two consenting sexual partners” one partner may not “hold the other liable in tort for the birth of a child conceived in an act of intercourse where the one partner relied on the other partner’s false representation that contraceptive measures had been taken”.
(4) The cause of action of fraud and deceit within the context of a paternity proceeding may well suffer from the very same problems that impelled legislative abolition of causes of action “based upon alleged alienation of affections, criminal conversation, seduction and breach of contract to marry”. (L 1935, ch 263, § 1.) The declaration of the public policy of the State in this regard provides an instructive analogy (L 1935, ch 263, § 1): “The remedies heretofore provided by law for the enforcement of actions based upon alleged alienation of affections, criminal conversation, seduction and breach of contract to marry, having been subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons wholly innocent and free of any wrongdoing, who were merely the victims of circumstances, and such remedies having been exercised by unscrupulous persons for their unjust enrichment, and such remedies having furnished vehicles for the commission or attempted commission of crime and in many cases having *288 resulted in the perpetration of frauds, it is hereby declared as the public policy of the state that the best interests of the people of the state will be served by the abolition of such remedies. Consequently, in the public interest, the necessity for the enactment of this article is hereby declared as a matter of legislative determination.”
(5) Anglo-American law has long muted its vigilance against fraud to vindicate its paramount concern for the family and the child. The law recognizes that “family relations and their regulation are so much a matter of public policy that the law in relation to them is based on principles not applicable in other cases * * * Thus a particeps criminis in the fraud has been permitted to recover in his own name against one who was no more guilty than he, when the marriage had taken place by reason of such fraud.” (Piper v Hoard, 107 NY 73, 77-78.) For example, “[i]n Neville v. Wilkinson (1 Brown Ch. 543), decided in 1782, the plaintiff was the individual who desired to marry his co-plaintiff’s daughter, and he and the defendant, who was an attorney to whom he owed a large amount of money, agreed that defendant should represent to the father that the debt was much less than in truth it was. He did so, and after marriage he brought an action on a bond which would have made the debt in excess of the amount represented, and the plaintiff, the particeps criminis, was permitted to succeed in an action brought by him and his father-in-law to compel the surrender of the bond.” (Piper v Hoard, supra, p 78.) See to like effect other cases cited in Piper v Hoard (supra), including the case of Montefiori v Montefiori (1 Blackstone [Wm] 363, Mansfield, Ch. J.). Granted, the law abhors fraud and deceit, but the law affords primacy to our society’s profound commitment to the family and the child even when the particeps criminis is a member of the protected entity. See, also, as to subordination of the public policy against fraud to the superior interest in the family and the child, Aghnides v Aghnides (308 NY 530, 532, 532-533; Domestic Relations Law, § 140, subd [e]) and as to the child (Domestic Relations Law, § 24; Family Ct Act, § 117).
(6) Equity has long lamented that the law cannot remedy all ills. Recognition of the limits of effective legal action *289 does not mean that the law approves conduct deemed beyond its reach. As wisely perceived by Judge Florence Allen, in concurring in Snedaker v King (111 Ohio St 225, 231), in dissolving an injunction sought by a wife against a “vampire”: “It has been urged that to dissolve this injunction is to condone the action of the plaintiff in error. Equity, however, refuses to enjoin many acts which it does not condone.” (See Albala v City of New York, 54 NY2d 269, 274, supra.)
Manifestly, the above considerations reflect the context of a paternity proceeding. Removed from that framework, the law of fraud and deceit is clear.[4] New York law has long been in the vanguard of jurisdictions that have adopted an expansive concept of actionable fraud. “In this jurisdiction protection is given to one who is injured by falsehood or deception; fraud vitiates everything which it touches, and destroys the very thing which it was devised to support; the law does not temporize with trickery or duplicity.” (Angerosa v White Co., 248 App Div 425, 431, affd 275 NY 524, cited with favor in Sabo v Delman, 3 NY2d 155, 161.)
Decisional and statutory prescriptions define the substantive, procedural[5] and evidentiary standards for a cause of action in fraud. “ ‘[Representation, falsity, scienter, deception and injury’ ” constitute the essential elements of a cause of action in fraud and deceit. (Sabo v Delman, 3 NY2d, at p 159, citing Ochs v Woods, 221 NY 335, 338.) New York public policy brands fraud as odious because fraud strikes at the very purpose of law in a civilized society. Yet, the courts have not been unmindful of the danger of “dishonesty and false swearing, induced, perhaps, by a change of purpose or a failure to obtain the result that was anticipated when the transaction was originally consummated”. (Adams v Gillig, 199 NY 314, 318.) In Rudman v Cowles Communications (30 NY2d 1, 10) in express reliance upon Adams v Gillig (supra), the Court of Appeals declared, “[F]raud must be made out by ‘satisfactory’ or ‘clear and convincing’ evidence”.
*290 Respondent failed to establish the defense of fraud and deceit even to a far lesser degree of certitude. Respondent accurately assumed that petitioner viewed motherhood as incompatible with her career plans. That assumption, however, does not mean that the petitioner may be cast into the role of guarantor against the natural consequences of the parties’ intimacies. Critical to the defense, respondent failed to prove misrepresentation as to contraceptive precautions or deception as to conception.
Order of filiation entered.

. In opposition to the admissibility of the report, respondent asserted legislative deficiencies in enacting the very statutory provision authorizing such admission. Such bare allegation of failure to investigate the probative value of blood grouping tests in disputed paternity cases is patently insufficient to affect the “presumption that the Legislature has investigated for and found facts necessary to support the legislation”. (I.L.F.Y. Co. v Temporary State Housing Rent Comm., 10 NY2d 263, 269; see for a discussion of the probative value of “blood test evidence in paternity cases”, Little v Streater, 452 US 1, 6-8; see, also, Mills v Habluetzel, 456 US 91, _, n 4.)

. (Miale, Jennings, Rettberg, Sell, & Krause, Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Family L Q 247,262.)

. (See, e.g., Mills v Habluetzel, 456 US 91; Trimble v Gordon, 430 US 762; Gomez v Perez, 409 US 535; Weber v Aetna Cas. & Sur. Co., 406 US 164; Levy v Louisiana, 391 US 68.)

. See for a discussion of fraud and constructive fraud, Hector M. v Commissioner of Social Servs. of City of N. Y. (102 Misc 2d 676).

. CPLR 3016 (subd [b]).